PUBLISH

IN THE UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT

_____

No. 94-6652

_____

D.C. Docket No. 93-00310 CR N11

FILED

U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
3/01/99
THOMAS K. KAHN
CLERK

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

CLENNON MATTHEWS,
a.k.a. "Big C"; WILLIAM D. THRASH, JODY MOORE, et al.,

Defendants-Appellants.

_____

No. 94-7047

_____

D.C. Docket No. 93-310-N

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

J.W. MOORE; JAMES MOORE, a.k.a. "Buster";
FRANCIS WILLIAMS;

Defendants-Appellants.

1

_____

No. 94-7051
_____

D.C. Docket No. 93-310-N

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

ARLUTHA W. SMILEY,

Defendant-Appellant.

_____

No. 94-7055
_____

D.C. Docket No. 93-310-N

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

ROSA MAE SMILEY WILLIAMS,

Defendant-Appellant.

_____

Appeals from the United States District Court for the
Northern District of Alabama
_____

**(March 1, 1999)**

Before EDMONDSON and BIRCH, Circuit Judges, and MORAN[*], Senior District Judge.

MORAN, Senior District Judge:

---

[*]Honorable James B. Moran, Senior U.S. District Judge for the Northern District of Illinois, sitting by designation.

FACTUAL BACKGROUND AND PROCEDURAL HISTORY

During 1989, as the result of several individual arrests for drug offenses, the Andalusia Police Department became aware of a large group of people engaged in the distribution of crack cocaine in Laurel Hill, Florida, along Ebenezer Road. The illegal drug transactions primarily took place in an area referred to as the "Quarters," which consisted of two mobile home trailer parks, Rosa Mae's Trailer Park and Mary Lou's Trailer Park, and the abutting stretch of Ebenezer. The Andalusia Police Department and the Okaloosa County Sheriff's Office engaged in a joint undercover investigation and discovered that the primary supplier for the area was Rosa Mae Smiley Williams, who assumed that position after the arrest of another major dealer in the area, Chico Moore, and whose trailer was used as a base of operations for the cocaine distribution efforts of various dealers as well as a storage place for narcotics, weapons and cash. From 1989 to 1993 the police carried out extensive video and audio surveillance, meticulously documented scores of drug transactions involving every person who was eventually indicted, and used informants to effect controlled transactions. On December 9 and 10, 1993, local and federal law enforcement cooperated to arrest many members of the conspiracy.

As a result of that investigation, and as amply supported by the evidence presented at trial, the government concluded that Rosa Mae Smiley Williams, Chico Fernandez Moore and J.W. Moore obtained their supply of cocaine and cocaine base from unindicted sources in Marianna and Miami, Florida, and elsewhere. Rosa Mae Williams and J.W. Moore were also supplied by Chico Moore. J.W. Moore, Chico Moore and Rosa Mae Williams would distribute drugs among the remaining defendants. Delacey Caldwell, who became a witness for the government at trial, was the "main" drug runner for Rosa Mae Williams. He would also carry weapons to protect himself, the drugs, and

3

others members of the drug ring who worked with him. Claudell Smiley, Arlutha Smiley, and Clennon Matthews also dealt substantial quantities of narcotics they bought from or were fronted by Chico Moore, and Arlutha would on occasion use stolen property to buy drugs. James Buster Moore and Jody Moore bought drugs for redistribution from Chico Moore, Rosa Mae Williams, Claudell Smiley, Clennon Matthews and J.W. Moore, the "major"dealers. Most of the other defendants were "runners" who would buy small quantities of cocaine to both redistribute to individuals along Ebenezer Road and use personally. They would either pay for these quantities with cash or the dealers would "front" the cocaine to the runners, who then sold the drugs and returned the profits to the dealer. In exchange for selling the cocaine, the runner would be allowed to keep a portion of the proceeds or a small piece of crack (sometimes referred to as a "piece" or a "cookie.")

On December 8, 1993, the United States filed an indictment in the District Court of the United States for the Middle District of Alabama, Northern District, charging twenty-seven co-defendants with conspiring to distribute and possess cocaine and cocaine base in violation of 21 U.S.C. §841(a)(1) and §846. Immediately prior to trial, several of the co-defendants pleaded guilty, including Rosa Mae Smiley Williams, Chico Fernandez Moore, Bridgett Chapple, Delacy Caldwell and Clennon Matthews. These defendants entered plea agreements with the United States Attorney wherein they agreed to provide complete and truthful information about the other members of the drug trade in exchange for the prosecution's promise to request a downward departure at sentencing. Arlutha Smiley and Clarence Smiley subsequently pleaded guilty as well, entering similar plea agreements. Pursuant to these agreements Rosa Mae Smiley Williams and her sons, Arlutha Smiley and Clarence Smiley, were interviewed about their knowledge of the drug trafficking activities of the other co-conspirators, and, although they apparently gave truthful information about several of

4

the defendants, they refused to implicate Claudell Smiley (also Rosa Mae's son). These interviews were conducted by Captain Jerry Newton, Assistant U.S. Attorneys Louis V. Franklin and Terry F. Moorer, and Investigator Mike Stewart of Okaloosa County Florida.

On May 16, 1994, the trial began for the remaining defendants, including Francis Williams, J.W. Moore, James Buster Moore, Jody Moore, William Thrash and Claudell Smiley, all of whom were ultimately convicted. The evidence at trial consisted of the testimony of several of the defendants' former co-conspirators, police informants and several of the police officers and sheriff's department officials who had conducted the investigation of the Laurel Hill conspiracy. Chico Moore and Delacy Caldwell, originally both co-defendants, gave testimony implicating themselves and, between the two of them, every other defendant. Captain Jerry Newton and Sheriff's Deputy Mike Stewart, who jointly investigated the crime, both testified at trial to witnessing the criminal acts of almost all of the defendants. In addition, Shirley Tanner, a former crack addict who regularly bought, or prostituted herself to obtain, crack cocaine from the Laurel Hill group, testified in exchange for help getting treatment for her addiction. After the trial Tanner was also given $1,000 when her mother unexpectedly needed emergency surgery and Tanner had no other means of paying her expenses. There were numerous additional witnesses at trial.

The defendants discussed above have now filed appeals on various grounds. The sheer scope of this conspiracy and the vast amount of evidence admitted at trial make it impractical and inefficient to particularly discuss the facts relating to each defendant here. Rather, we will refer to specific portions of the record as necessary to the resolution of the various grounds for appeal.

ISSUES PRESENTED AND ANALYSIS

I. Motions for New Trial

On August 2, 1994, the prosecution was informed that Captain Jerry Newton, one of the officers who had been heavily involved in the investigation of the Laurel Hill conspiracy, was the subject of an internal investigation by his employer, the Andalusia Police Department. On November 14, 1994, Captain Newton's employment was terminated. On January 12, 1995, the United States sent a letter to the district court hearing the Laurel Hill case, informing it of Newton's termination and outlining the charges against him, which were (1) the falsification of records pertaining to the payment of confidential informants, ostensibly in other, unrelated cases; and (2) false statements made to Police Chief Jerry Williamson concerning witness fees and other reimbursements paid to Captain Newton in this case. The court set a hearing for February 16, 1995, which was continued until March 15-16, 1995, to allow further investigation of the matter. At the hearing, the court considered the various motions filed in response to the government's disclosure of Newton's improprieties. Among other matters, the court heard motions for a new trial from both the tried and convicted defendants, as well as those who had pleaded guilty and sought either new sentencing hearings or the opportunity to revoke their pleas. In an order filed September 4, 1996, the court denied these motions and numerous appellants now contest that decision. We will not reverse the trial court's ruling on this matter unless we find that it abused its discretion. United States v. Jones, 913 F.2d 1552, 1565 (11th Cir. 1990).

We will first address the claims of Clennon Matthews, Rosa Mae Williams and Arlutha Smiley, who pleaded guilty to the conspiracy charges and agreed to give truthful statements about other defendants in exchange for the prosecution's promise to request on their behalf downward departures at sentencing. The government honored its plea agreement with Clennon Matthews, but refused to move for a downward departure for Rosa Mae and Arlutha Smiley because the statements

6

they made were not entirely truthful. Specifically, the latter defendants stated that they were unaware of the nature and extent of their son/brother's, Claudell Smiley's, involvement in the conspiracy, when other evidence clearly indicated that this was not true (interviews, Rosa Mae Smiley Williams, 3/25/94; Arlutha Smiley, 4/25/94 and 3/3l/94). On appeal, the three defendants claim they are either entitled to a new sentencing hearing or to revoke their pleas altogether. Clennon Matthews argues that he would not have pleaded guilty had he known about Captain Jerry Newton's corruption, and Rosa Mae Williams and Arlutha Smiley claim prejudice because Captain Newton participated in taking their statements, from which statements the prosecution concluded that the defendants were not being completely truthful. Matthews, Williams and Smiley argue, in essence, that the prosecution was required to disclose Detective Newton's suspension under <u>Brady v. Maryland</u>. 373 U.S. 83, 87 (1963).

The district court denied the request for a new trial, relying on the traditional rule that by accepting a guilty plea a defendant waives all non-jurisdictional defenses. *See* <u>Martin v. Kemp</u>, 760 F.2d 1244, 1246 (11th Cir. 1985). Relying on a Fifth Circuit opinion, the court further noted that the defendants who pleaded guilty had, in doing so, waived their right to trial and consequently could not seek a new one. *See* <u>Williams v. United States</u>, 290 F.2d 217, 218 (5th Cir. 1961).

Although usually stated as axiomatic, the rule that a defendant who pleads guilty waives all non-jurisdictional defenses is not absolute. *See, e.g.,* <u>United States v. Kaiser</u>, 893 F.2d 1300 (11th Cir. 1990) (challenges to convictions upon guilty pleas are limited to whether the underlying plea was counseled and voluntary); <u>United States v. Wright</u>, 43 F.3d 491 (10th Cir. 1994) (plea of guilty does not prevent defendant from arguing that his claim was improperly induced); <u>Acha v. United</u>

7

States, 910 F.2d 28 (1st Cir. 1990) (guilty plea does not prevent defendant from raising claim for ineffective assistance of counsel in the process by which the plea was accepted).

We do not need to decide today, however, whether a guilty plea waives a defendant's claim under Brady, or -- assuming that a Brady claim is not waived by a guilty plea – whether the Brady material must be known to the prosecution before the plea or merely before sentencing. Nor do we need to decide whether a suspension, like Detective Newton's suspension, is sufficiently material to mandate Brady disclosure. Even if we accept that a guilty plea does not waive a defendant's Brady claim, that Brady information learned by the prosecutors after the plea but before sentencing must be disclosed, and that Detective Newton's suspension is material enough to require disclosure under Brady, the defendants' arguments must still be rejected.

First, Clennon Matthews' plea and sentencing both occurred prior to August 2, 1994, the date upon which the prosecution acknowledges that it became aware of the disciplinary investigation of Detective Newton. Matthews does not argue that the police department's knowledge of the investigation was imputed to the prosecution prior to this date, and he has not otherwise shown that the prosecution knew of the investigation at either the time of his plea or his sentencing. Moreover, there is no indication in Clennon Matthews' sentencing record[1] that the court relied on Officer Newton's testimony or his role in the investigation. Rather, the transcript reveals that the government's evidence against Matthews consisted primarily of statements by Chico Moore, Shirley Tanner and Deputy Michael Stewart. Accordingly, there is no reason to believe that a disclosure of

---

[1] The transcript of Clennon Matthews' sentencing hearing, dated July 13, 1994, before Judge Ira DeMent, can be found at Volume 27 of the trial record.

the police department's investigation of Officer Newton would have affected Matthew's decision to plea.

Similarly, Rosa Mae Williams and Arlutha Smiley pleaded guilty on March 14 and April 21, 1994, months before the government was made aware of the Newton information. Thus, the government's obligation to disclose, if any, had not arisen. Unlike Matthews, however, Williams and Smiley were sentenced October 19 and October 20, 1994. In essence, these appellants argue that they are entitled to a new sentencing hearing because, if it had been made aware of Newton's dishonesty, the sentencing court would have been less likely to honor the prosecution's request that their plea agreements be disregarded on the ground that Williams and Smiley had failed to provide truthful statements about the activities of other members of the conspiracy, particularly Claudell Smiley.

We disagree. Even if we continue to assume that Williams and Smiley can raise a Brady claim after pleading guilty, that Brady information learned by the prosecution after the plea must be disclosed, and that Brady would require disclosing Detective Newton's suspension, the alleged error is harmless. Had the internal investigation been disclosed, it is unlikely that the government would have used Newton at sentencing. Even without considering Newton's testimony, however, the transcript contains overwhelming evidence implicating both Arlutha Smiley and Rosa Mae Williams in the conspiracy and indicating that they would have been aware of Claudell Smiley's involvement.[2] Further, Captain Newton's involvement in every aspect of the events relevant to the pleas and sentencing is independently corroborated by other evidence. The transcripts indicate that Okaloosa

---

[2] Such evidence is detailed *infra* in Section VI, where appellants' sentencing claims are addressed, and we consequently need not review the supporting facts here.

County Sheriff's Deputy Stewart was present at both interviews of Arlutha Smiley, on March 31 and April 25, 1994. And the interview of Rosa Mae Williams, who was apparently interviewed by Newton alone and thus presents the most obvious point at which he could have influenced or misrepresented the content of her statement, was recorded and transcribed. The trial record indicates that the sentencing judge was presented with the transcripts of these interviews and had the opportunity to independently assess what the witnesses said. Moreover, between the trial and the hearing, the court considered the testimony of numerous witnesses who contradicted the statements Arlutha and Rosa Mae made about their relationship with Claudell, among others. For these reasons, information about the police department's internal investigation of Captain Newton's dishonest conduct does not warrant a revocation of their pleas or new sentencing hearings.

With respect to the defendants found guilty at trial, we find for the same reasons that it is not reasonably probable that a disclosure of the information at issue would have changed the outcome of the trial or the sentences of those convicted. As with the pleas discussed above, at the time of trial the government was unaware that Newton was the subject of investigation. Moreover, any testimony provided by Newton was corroborated, often by multiple witnesses. Even if we disregard Newton's testimony entirely, the testimony of Shirley Tanner, Delacey Caldwell and Chico Moore provides ample evidence upon which the jury could have based its decision to convict. We accordingly conclude that the internal investigation of Officer Newton was not material under the Supreme Court's <u>Brady</u> decision.

II. <u>Exclusion of Shirley Tanner's Arrest</u>

One of the government's chief witnesses at trial was Shirley Tanner, a drug addict who cooperated with the police during the conspiracy investigation and participated in controlled

10

undercover drug buys from almost all of the defendants. When questioned about her motives for testifying, Tanner stated that she cooperated with the government because they promised to put her in a drug rehabilitation program and help her get her life back together. At trial defendants sought to admit Covington County docket sheets indicating that at one time Tanner had been arrested for the unauthorized use of a vehicle. Relying on Federal Rules of Evidence 405(b) and 608(b), defendants intended to use such evidence to show that the charges against Tanner were dropped in exchange for her cooperation in the conspiracy case and that was her true motive for testifying. Defendants' attorneys, however, were unable to show any connection between the government's previous failure to bring charges on the matter of the unauthorized use of a vehicle and Tanner's participation in the conspiracy case (Rec.17:1184). Moreover, both Tanner and the prosecution maintained (and offered proof) that the docket sheets were in error and that Tanner was never charged in relation to the crime, which they claimed had arisen from a misunderstanding with the owner of the vehicle and was for that reason dropped. The trial judge allowed the defense to extensively question Tanner about the unauthorized-use accusations and her role in taking the vehicle, but once Tanner had specifically denied that she was arrested, the court refused to let the defense question her further about whether she was arrested or admit documentary evidence to that effect. (Rec.17:1180-92).

Federal Rule of Evidence 405 generally prohibits the use of specific prior acts as proof of character to show action in conformity with a character trait evidenced by the behavior. Evidence of prior conduct may, however, be used as circumstantial evidence of a non-character issue, such as motive, intent, opportunity, knowledge, or other issues material to the charge. Where impeachment is concerned, Rule 608(b) provides that the trial court may in its discretion permit questioning about

11

a witness' prior bad acts on cross-examination, if the acts bear on the witness' character for truthfulness. If the witness denies the conduct, such acts may not be proved by extrinsic evidence and the questioning party must take the witness' answer, United States v. Cohen, 631 F.2d 1223, 1175-76 (5th Cir. 1980); United States v. Herzberg, 558 F.2d 1219, 1223-24 (5th Cir. 1977), unless the evidence would be otherwise admissible as bearing on a material issue of the case. U.S. v. Calle, 822 F.2d 1016, 1021 (11th Cir. 1987). Limitations on the scope and extent of cross-examination are matters expressly committed to the sound discretion of the trial judge and we review such decisions only for a clear abuse of discretion. *See* United States v. Sudderth, 681 F.2d 990, 996 (5th Cir. 1982).

Tanner's alleged arrest for unauthorized use of a vehicle does not bear on a material issue in the conspiracy case and Rule 405 consequently does not apply. Even if we assume that questions about the misconduct itself were permissible as bearing on her credibility, Rule 608 specifically prohibits extrinsic proof of such acts and consequently the district court properly excluded the docket sheets purporting to detail the arrest. Because the government claimed that the arrest had never taken place and the docket sheets were in error, and because defendants' theory that the charges had been brought and dropped in exchange for Tanner's cooperation were speculative and unsupported by any evidence, the district court also had the discretion to prohibit further questions about the alleged arrest until defendants could find support for their theory. Thus we cannot say the trial judge abused his discretion in excluding evidence of Tanner's alleged arrest.

III. Multiple and Single Conspiracies

Defendants William Thrash, James Buster Moore, Francis Williams and Jody Moore argue that their conspiracy convictions are invalid because although the indictment charged a single

12

cocaine distribution conspiracy involving all defendants, the proof at trial established only multiple individual conspiracies between the various defendants and Rosa Mae Williams.   We do not reverse convictions on this ground unless the variance is material *and* substantially prejudiced the defendants.  United States v. Alred, 144 F.3d at 1414 (11th Cir. 1998).  In determining whether any variance was material, we view the evidence in a light most favorable to the government and inquire whether a reasonable jury could have determined beyond a reasonable doubt that a single conspiracy existed.  United States v. Coy, 19 F.3d 629, 633 (11th Cir. 1994).  We will not disturb the jury's determination that the defendants were engaged in one far-reaching conspiracy if that finding was supported by substantial evidence.  Alred, 144 F.3d at 1414 *citing* United States v. Calderon, 127 F.3d 1314, 1327 (11th Cir.1997).  To decide whether the jury could have found a single conspiracy, we review "(1) whether a common goal existed;  (2) the nature of the underlying scheme;  and (3) the overlap of participants." *Id.*  Only if we conclude that the proof at trial established only multiple individual conspiracies do we examine whether any substantial prejudice resulted to the defendants.

Appellants acknowledge that both Rosa Mae Williams and Chico Moore functioned as cocaine suppliers to many of the co-defendants, and thus that there were numerous individual conspiracies to distribute cocaine between these suppliers and the lower-level dealer defendants.  They argue, however, that because the evidence at trial failed to link the various suppliers, dealers and buyers to each other in an all-inclusive conspiracy, the single-conspiracy convictions violated Kotteakos v. United States, 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946) (holding that if at trial the government produces evidence that each defendant had a conspiratorial relationship with a single outside person, but fails to show that the defendants also were aware of and conspired with each other, the government has proved only multiple individual conspiracies rather than one agreement

13

encompassing all defendants). We disagree with appellants and find the situation before us distinguishable from Kotteakos.

At trial, Delacey Caldwell testified that he frequently sold cocaine on Ebenezer Road, the street running through Laurel Hill, where most of the individual drug sales took place. He stated that J.W. Moore, Buster Moore, Claudell Smiley and Rosa Mae Smiley would frequently buy cocaine from an outside supplier named Luis. These four (who, in addition to Chico Moore, the prosecution refers to as the "major players" in the drug distribution ring) would then sell to the other defendants, including Delacey Caldwell, who would then deal the drugs on the street to individual buyers (Rec.20:1830). Thus, when Delacey Caldwell went to deal drugs he would first buy a quantity from Rosa Mae or Claudell, or, if neither had a supply, from J.W. or Buster Moore (Rec.20-1831). To assist the sales, while there were dealers on the street Rosa Mae Smiley would monitor a police scanner that she kept in her trailer and, when she received notice of police presence in the Laurel Hill area, would come out and notify the dealers, who would then temporarily get off the street (Rec.20-1832). Similarly, Chico Moore testified that before he was arrested he would supply drugs to various members of the conspiracy and gave testimony that specifically indicates the members of the conspiracy were working in conjunction with him and others to achieve a common goal of purchasing and distributing drugs. For example, he testified that on at least one occasion he spoke with his cousins Jody and Buster Moore about arranging for a drug purchase in another town, Fort Watson, and that at other times he had bought and sold cocaine both with Buster Moore and Thrash Williams (Rec.22-2329-30, 2356). He also testified that he had previously lived with Francis Williams, during which time Claudell Smiley would come to their house to purchase cocaine, and discussed transactions with Rosa Mae Smiley (Rec.22-2346, 2371). The remainder of the record is

14

replete with testimony connecting the various defendants to one another in their distribution efforts. Viewing this evidence in a light most favorable to the government, the jury could reasonably have concluded that the defendants were interconnected in a complex but single scheme to distribute cocaine in the Laurel Hill area. A reasonable trier of fact could find that all of the defendants were mutually interested and involved participants in an open Laurel Hill drug market. *See* United States v. Adams, 1 F.3d 1566, 1584 (11th Cir.1993); United States v. Reed, 980 F.2d 1568, 1581 (11th Cir. 1993). Accordingly, we find that there was no material variance between the indictment and the proof presented at trial.

IV. Proof of a Single Conspiracy

Appellants William Thrash, James Buster Moore, Francis Williams and Jody Moore next contend that insufficient evidence was presented to prove their involvement in a single large-scale conspiracy. To sustain a conviction for conspiring to distribute narcotics the government must prove that 1) an agreement existed between two or more persons to distribute the drugs; 2) that the defendant at issue knew of the conspiratorial goal; and 3) that he knowingly joined or participated in the illegal venture. United States v. Guerrero, 935 F.2d 189, 191 (11th Cir. 1991). "The government may establish a defendants' knowing participation in the conspiracy through proof of surrounding circumstances, such as acts committed by the defendant that furthered the purpose of the conspiracy." *Id.* The evidence discussed above is sufficient basis from which the jury could have concluded that all three of these prongs were met and defendants were consequently guilty of participating in a single distribution conspiracy.

V. Venue

15

Appellants James Moore, William Thrash, Francis Williams and Jody Moore next claim that the district court for the Middle District of Alabama was an improper venue in which to hold the trial. They argue first that the government erroneously relied on Chico Moore's testimony, in which he stated that he made numerous cocaine buys in Alabama, in determining the geographical boundaries of the conspiracy. Appellants base this argument on their now discredited claim that the government failed to prove a single conspiracy involving all defendants and consequently venue must be determined with respect to each individual conspiracy, considering only the locale of the acts constituting that particular crime. Defendants further argue that in determining proper venue the district court should not have considered the May 27, 1993 arrest of Willie Sconiers in Andalusia, Alabama, because he was subsequently acquitted. We find this latter argument to be without merit.

"This Court reviews a challenge to venue in the light most favorable to the government, and makes all reasonable inferences and credibility choices in favor of the jury verdict when deciding whether the government has proved, by a preponderance of the evidence, that an offense has occurred in the trial district." United States v. Smith, 918 F.2d 1551, 1557 (11th Cir. 1990). Title 18 of the United States Code, governing the jurisdiction and venue of the federal courts, provides that "any offense begun in one district and completed in another, or committed in more than one district, may be inquired of and prosecuted in any district in which such offense was begun, continued, or completed." 18 U.S.C. 3237(a). Where a conspiracy is concerned, venue is thus proper in any district where "an overt act" was committed in furtherance of the conspiracy. Smith, 918 F.2d at 1557. The overt act need not be committed by a defendant in the case; the acts of accomplices and unindicted co-conspirators can also expose the defendant to jurisdiction. *See* United States v. Delia, 944 F.2d 1010, 1014 (2d Cir. 1991). Moreover, the fact that a majority of a

conspiracy's activity took place in a venue other than the one where the trial takes place does not destroy venue. U.S. v. Dabbs, 134 F.3d 1071, 1079 (11th Cir. 1998).

As discussed above, the government proved that William Thrash, James Buster Moore, Francis Williams and Jody Moore were involved in a single drug distribution conspiracy, one of the participants of which was Chico Moore. The defendants do not dispute that Chico Moore's testimony established that he and other defendants engaged in numerous overt acts in furtherance of the conspiracy in the geographic area encompassing the Middle District of Alabama. Nor do they dispute, as the district court observed, that several other witnesses, including Shirley Tanner, Timmy Barlow, Delacey Caldwell, Sylvia Matthews, Mike Stewart and Tony Harrison, provided similar testimony. For example, Sylvia Matthews testified that Chico Moore and J.W. Moore would come to her home in Andalusia, Alabama, to sell her cocaine. Having established a single conspiracy, the government only had to show that one co-conspirator took such acts within the district court's venue which, in light of the testimony presented at trial, we find it did.[3]

VI. Claims Based on the Sentencing Guidelines

The defendants attack their sentences on various grounds. We observe at the outset that we will not disturb the district court's determination on these matters unless its decision was clearly

---

[3] The testimony discussed in this section is alone sufficient to establish venue in the Middle District of Alabama, and we consequently need not discuss appellants' argument that in determining venue the district court should not have considered the arrest of Willie Sconiers in Andalusia, Alabama. We note, however, that the acquittal of a co-defendant is a reflection only of a lack of proof of his guilt beyond a reasonable doubt and is thus analytically distinct from the determination of whether the government proved by a preponderance of the evidence that the acquitted party acted in furtherance of the conspiracy in a particular geographic location. *See*, United States v. Nocoll, 664 F.2d 1308, 1311 (5th Cir. Unit B, 1982) *overruled on other grounds by* United States v. Henry, 749 F.2d 203 (1984).

erroneous.  U.S. v. Gates, 967 F.2d 497 (11th Cir. 1992); United States v. Robinson, 935 F.2d 201, 205 (11th Cir. 1991).

A.  Base Sentencing Levels

Defendants William Thrash, James Buster Moore, Jody Moore and Francis Williams argue that the trial court erred in determining the amount of cocaine attributable to them for purposes of determining their base offense level under Guideline §1B1.3(a).  At sentencing, the government bore the burden of establishing the drug quantity level by a preponderance of the evidence and we reverse the sentencing court's drug determination only if it was made in clear error.  United States v. Mertilus, 111 F.3d 870, 873 (11th Cir. 1997).  In determining the base level of the charged offense, the district court must consider as relevant all conduct actually undertaken by, or taken at the direction of, the defendant, §1B1.3(a)(1)(A), and, in the case of a conspiracy, all acts by other participants that were both reasonably foreseeable and in furtherance of the conspiracy, §1B1.3(a)(1)(B).  *See also* §1B1.3(a) Application note 2.  "Even if the court does not make individualized findings regarding the scope of the defendant's criminal activity and the contraband quantities reasonably foreseeable at his level of participation, the sentence can be upheld if the record supports the district court's determination of the drug quality, including imputing others' unlawful acts to the defendant."  Mertilus, 111 F.3d at 873 *citing*  United States. v. Ismond, 993 F.2d 1498, 1499 (11th Cir. 1993).

James Buster Moore's sentence was based on the sentencing court's determination that, while a member of the Laurel Hill conspiracy, he was involved in transactions totaling between 1.5 to 5 kilograms of cocaine (Rec.40:6-9).  At sentencing, the government called Chico Moore, who testified that during the two-year period (1991-1993) that Buster was a member of the conspiracy Moore had

18

sold between one-half and one kilogram of cocaine to Buster (Rec.40:6-9); that Buster and his brother had been arrested in possession of at least 54 grams (Rec.40:12); and that Buster regularly sold $50 rocks (or "cookies") to at least four runners.[4] Delacey Caldwell, a former crack addict who was indicted and charged with being part of the Laurel Hill conspiracy, also testified that between 1992 and 1993 he bought between two and three ounces of crack from Buster (Rec.40:42-3); that he had witnessed Buster buy one or two ounces from Claudell Smiley (Rec.40:45); and that he knew of five or six other runners who regularly purchased from Buster as well (Rec.40:43). In addition, several of the witnesses at trial testified that they had either witnessed or participated in several more transactions with Buster Moore. In light of this evidence, the district court's determination that the defendant's base offense level should be predicated on transactions totaling 1.5 to 5 kilograms of crack cocaine was not clearly erroneous.

The remaining three defendants contesting their base sentences, William Thrash, Jody Moore and Francis Williams, were each assigned a base cocaine level of between 500 milligrams and 1.5 kilograms. The sentencing court did not err in setting these levels. For four to six months during 1991, Jody Moore began buying cocaine from his cousin Chico Moore, who estimated that he sold Jody a total of one-quarter kilogram during that period (Rec.42:18-9). In addition, Chico testified that Jody accompanied him on several purchasing trips outside of Laurel Hill, where they bought a

---

[4] As do several other appellants, Buster insists that Chico Moore was not part of the Laurel Hill conspiracy and consequently argues that the district court should not have considered transactions involving Chico in determining the base offense level. There is clearly no merit to this argument. Chico Moore was one of the twenty-seven defendants charged in this case and has pleaded guilty to the conspiracy to possess and distribute charges. We have upheld the verdict of a single conspiracy in which Moore was a co-conspirator. Thus, their joint drug activities clearly constitute acts in furtherance of the conspiracy under §1B1.3(a)(1)(B).

total of approximately 20 ounces, or approximately 560 grams. *Id.* This testimony alone establishes that Jody Moore was involved with a minimum of 500 milligrams of cocaine.

Similarly, Francis Williams' participation in various drug buys with Chico Moore likewise puts her well over the 500 milligram mark. The evidence establishes that she and Chico lived together and that he regularly sold cocaine out of their home, often with her present and assisting, in sales totaling at least a half kilogram (Rec.22:2361-2). Additionally, she went on several purchasing trips with Chico, on at least one of which he bought a full kilogram and Williams assisted by folding the money. (Rec.37:21).

Finally, William Thrash argues that in sentencing him the trial court erred when it relied not on his own conduct but on conduct of his co-conspirators, particularly Chico Moore. We disagree. The evidence shows that during 1993 (the only year of the conspiracy that Thrash lived in Laurel Hill), he dealt repeatedly with Chico Moore; took Chico on a 22-gram buy from Thrash's regular sources (Rec.22:2350-51); was fronted between a half- and a quarter-ounce of cocaine by Chico on numerous occasions (Rec.22:2351-53); regularly sold the fronted cocaine in Laurel Hill (Rec.22:2351); traveled to Crestview with Chico to make a $1,600 purchase (Rec.22:2355-56); and to Pensacola to buy 2 ounces for $2,000 from one of Chico's sources. At this level of involvement it was evident to William Thrash that Chico Moore was a major drug supplier in the Laurel Hill area, and his buys and sells in this capacity were reasonably foreseeable to Thrash and clearly in furtherance of the cocaine distribution conspiracy.

B. Firearm Enhancement

Defendants Arlutha Smiley, Clennon Matthews and Jody Moore argue that the district court erred in enhancing their sentence classification under U.S.S.G. §2D1.1(b)(1), which provides for a

two-point increase in drug trafficking cases where the defendant possessed a firearm. A defendant's sentence may also be enhanced for possession by a co-conspirator if (1) the actual possessor is charged as a co-conspirator; (2) the co-conspirator possessed the firearm in furtherance of the conspiracy; and (3) the defendant who receives the enhancement was involved in the conspiracy at the time of the possession. United States v. Otero, 890 F.2d 366, 367 (11th Cir. 1989) (*per curiam*). *See also* United States v. Gates, 967 F.2d 497 (11th Cir. 1992) *cert. denied,* 506 U.S. 1011 (1992). The enhancement is only appropriate if the government establishes these facts by a preponderance of the evidence. *See* U.S. v. Ignancio Munio, 909 F.2d 436, 439 (11th Cir. 1990) *cert. denied,* 499 U.S. 938 (1991).

Four of the appellants' co-conspirators possessed firearms during the course of the conspiracy: Delacey Caldwell was videotaped holding a gun during one drug transaction, and he later testified that guns were carried for protection; nineteen guns were recovered from Rosa Mae's home, the focal point of many of the largest deals; the police found a loaded gun next to a quantity of crack cocaine under the sofa cushion on which Arlutha Smiley was sleeping when he was arrested; and Claudell Smiley gave his runners guns to use to protect their cocaine cargo (Rec.38–13, 14, 19; 20:34-36). This evidence establishes all three prongs of the Otterro test and the sentencing court's enhancement of appellants' sentences was consequently not clearly erroneous.

C. Employment Record

Arlutha Smiley argues that he is entitled to a downward reduction in his sentence on the basis of a favorable employment record and the fact that he has substantial family responsibilities. Guidelines §5H1.5 provides that although a defendant's employment record is not usually relevant in determining sentence modification, it may be relevant in determining the condition of probation

or supervised release, such as the appropriate number of hours of home detention. Similarly, Guidelines §5H1.6 provides that although family ties and responsibilities are not usually relevant in determining sentence modification, they might be relevant to determining the amount of restitution or fine.

In United States v. Mogel, 956 F.2d 1555 (11th Cir. 1992), the court considered these guidelines and explained that to overcome their narrow realm of applicability a defendant must show that his employment and family concerns were "present to a degree substantially in excess of that which ordinarily is involved in the offense." Arlutha Smiley presented evidence that he has consistently held a job as a truck driver and has a seven-year old son to whom he contributes support. These facts do not, however, distinguish him significantly from the rest of the general population and the district court did not err in denying this departure.

D. Minor or Minimal Participant

Under U.S.S.G. § 3B1.2, the sentencing court must reduce a defendant's offense level by four levels if it determines that the defendant was a "minimal" participant in the convicted offense, U.S.S.G. §3B1.2(a), or by two levels if the defendant was a "minor" participant. U.S.S.G. §3B1.2(b). A "minimal participant" is any conspiracy defendant who is "plainly among the least culpable of those involved in the conduct of a group." U.S.S.G. §3B1.2, Application note 1. A "minor participant" is any defendant who is "less culpable than most other participants, but [his] role could not be described as minimal." U.S.S.G. §3B1.2, Application note 3. The application note further provides:

> It is intended that the downward adjustment for a minimal participant will be used infrequently. It would be appropriate, for example, for someone who played no other role in a very large drug smuggling operation than to off load part of a single

22

marihuana shipment, or in a case where an individual was recruited as a courier for a single smuggling transaction involving a small shipment of drugs.

*Id.* at notes 2 and 3. Defendant bears the burden of showing the appropriateness of this departure by a preponderance of the evidence. Ignancio Munio, 909 F.2d at 439. The district court, considering a drug distribution conspiracy, is justified in denying a downward departure under these sections to any defendant who regularly sells or purchases drugs, U.S. v. Lokey, 945 F.2d 825 (5th Cir. 1991), or to any defendant who serves as a liaison between other co-conspirators or arranges transactions, U.S. v. Gates, 967 F.2d 497 (11th Cir. 1992).

Francis Williams and James Buster Moore were classified as minor participants under §3B1.2(a). They contend, however, that the district court should have classified them as minimal participants under §3B1.2(b) and granted them an additional two-level downward departure. We disagree. As discussed above, although Francis Williams undertook few, if any, independent drug transactions, she was heavily involved in Chico Moore's regular Laurel Hill deals and cocaine purchasing trips outside of the area. With respect to Buster Moore's claim, Delacey Caldwell testified that Moore sold him, and at least five other persons, cocaine for personal use and redistribution over a two-year period (Rec.40:41-42). In light of both Williams' and Caldwell's extensive involvement in numerous transactions, we cannot say that the district court clearly erred in refusing to classify them as minimal participants.

Jody Moore claims that he is entitled to classification as a minor participant because his involvement was primarily for personal use instead of distribution. As previously discussed, however, the evidence establishes that he accompanied his cousin Chico Moore on numerous

23

substantial cocaine purchases and consequently we find that the district court did not err in finding that he was not among the less culpable of defendants.

E. Supervisory Role

Clennon Matthews argues that the district court erred in increasing his sentence level by three points for being a manager or supervisor of at least one other person in a criminal organization that involved five or more participants. U.S.S.G. § 3B1.1(b) and Application note 2. Among other factors, the sentencing court should consider the nature of defendant's participation in the conspiracy as well as his use and recruitment of other members. *Id.* at note 4. In a drug distribution case such as this one, the management enhancement is appropriate for a defendant who arranges drug transactions, negotiates sales with others, and hires others to work for the conspiracy. U.S. v. Stanley, 24 F.3d 1314, 1323 (11th Cir. 1994); U.S. v. Clavis, 956 F.2d 1079, 1096 (11th Cir. 1992).

Matthews argues that his sentence should not have been enhanced for a managerial role because he did not have control over others or the power to force them to engage in criminal acts. This argument misinterprets the relevant inquiry under the guidelines – control over co-conspirators is not required. Matthews does not dispute that the evidence at trial established that he fronted or directly sold cocaine to numerous "runners" who would then sell the drug to buyers along Ebenezer road, giving Matthews the resulting profit (Rec.27:18-9). In exchange for this service the runners would generally be entitled to a small amount of cocaine for their own personal use. This undisputed activity was sufficient to justify the sentencing court's enhancement under §3B1.1(b).

F. Acceptance of Responsibility

Claudell Smiley and Clennon Matthews argue that the district court erred in denying their request for a two-point decrease under U.S.S.G. §3E1.1, which permits the decrease if the defendant

"clearly demonstrates acceptance of responsibility for his offense." Another point may be subtracted if defendant shows that he provided timely information about his involvement or gave the prosecution timely notice of his intent to plead guilty. We have observed that "[t]he district court is in a unique position to evaluate whether a particular defendant has truly accepted the responsibility for his actions." U.S. v. Hromada, 49 F.3d 685, 691 (11th Cir. 1995). Accordingly, we will not disturb its determination of this issue unless we find the denial lacked foundation. United States v. De La Rosa, 922 F.2d 675, 680 (11th Cir. 1991).

The district court denied Clennon Matthew's request because he admitted at sentencing that he had continued to use marijuana while the trial was pending. The guidelines provide that the sentencing judge must consider all relevant information, including whether the defendant has voluntarily terminated the criminal conduct. *See also* United States v. De La Rosa, 922 F.2d 675, 680 (11th Cir. 1991). Matthew's continued use of illegal drugs constitutes in part a continuation of the offense for which he was indicted and the district court's denial of the decrease was consequently not clearly erroneous.

Claudell Smiley argues that he is entitled to a decrease in his sentence because although he did not cooperate prior to trial or testify, after his conviction he agreed to give a statement to the government for use in later prosecutions of additional members of the drug trade. In exchange for this cooperation, the prosecution recommended a five-point downward departure which the district court accepted at sentencing. Claudell maintains that his cooperation entitles him to an additional two-point reduction for acceptance of responsibility. We disagree.

Although a defendant's failure to plead guilty does not automatically preclude a reduction for acceptance of responsibility, only in rare situations will a defendant who is convicted at a trial

25

be entitled to the decrease. U.S.S.G. §3E1.1, Application Note 2. The adjustment "is not intended to apply to a defendant who puts the government to its burden of proof at trial . . . is convicted, and only then admits guilt." *Id.* There are rare circumstances in which the reduction is allowed for a tried and convicted defendant, such as where he went to trial only to assert and preserve constitutional and other issues that do not relate to factual guilt. *Id.* Even then, however, the district court's determination of whether to grant the reduction should be "based primarily upon pre-trial statements and conduct." *Id.* Claudell Smiley did not cooperate with the government during the investigation and forced the prosecution to seek a conviction by trial. Particularly in light of the five-point downward departure that he has already been granted in exchange for his post-trial cooperation, the district court did not clearly err in denying the additional reduction.

VII. Constitutionality of Crack Cocaine Sentencing Guidelines

Under 21 U.S.C. §§841 and 846, and the corresponding sentence enhancement provisions at U.S.S.G. §2D1.1, an individual convicted of dealing or possessing crack cocaine (an intense form of cocaine base) is subject to longer sentences than a person convicted of dealing or possessing the same amount of powdered cocaine. Specifically, crimes involving 50 grams or more of cocaine base (crack) are subject to the same 10 years minimum sentence as crimes involving 5,000 grams of cocaine powder (commonly known as the "100 to 1 ratio"). *See* 21 U.S.C. §841(b)(1)(A)(iii) (cocaine base provision); 21 U.S.C. §841(b)(1)(A)(ii)(II) (cocaine powder provision); U.S.S.G. §2D1.1(a)(3). Since their enactment, these sentencing provisions have been attacked on the ground that the sentencing disparity violates the Equal Protection Clause because crack cocaine convictions tend to involve poor urban African-American defendants while powder cocaine use is more common among wealthier whites. The sentencing disparity, this argument goes, results in impermissible

26

racial discrimination by subjecting black defendants to stiffer penalties for similar offenses. The Supreme Court recently refused to review the Eleventh Circuit's rejection of this argument and there is no reason for us to reconsider the issue here. *See* United States v. Sloan, 97 F.3d 1378 (11th Cir. 1996) *cert. denied*, 117 S.Ct. 2459 (1997); *see also* United States v. Munoz-Realps, 21 F.3d 375 (11th Cir. 1994). The various circuit courts agree that there are numerous legitimate and non race-related reasons why Congress may have included the distinction between cocaine base and cocaine powder, and it is not for the courts to interfere in that determination. *See, e.g.*, United States v. Jackson, 84 F.3d 1154 (9th Cir. 1996) (citing valid reasons for sentence disparity, such as crack's greater concentration and intensity, the youth of its users and sellers, the low per-dose cost resulting in easy distribution, and the violence frequently correlated with the use and dealing of the drug); U.S. v. Williams, 982 F.2d 1209 (8th Cir. 1992) (same); U.S. v. Galloway, 951 F.2d 64 (5th Cir. 1992) (same). These legitimate goals defeat challenges to the guidelines under the Equal Protection clause.

VIII. Erroneous Crack Cocaine Jury Instruction

Before releasing the jury to deliberate, the district court judge charged the jury on crack addiction with the following statement:

> Now from time to time you have heard that some of the defendants were addicted to crack cocaine or other controlled substances. Mere addiction to crack cocaine or any other controlled substance is not a defense to possession with intent to distribute crack cocaine, or conspiracy to possess with intent to distribute crack cocaine. However, if the defendant *were under the influence* of crack cocaine such that it destroyed the ability to form the criminal intent required in each offense, then you cannot convict the defendant of that offense.

Appellant Jody Moore argues that the last sentence of the jury instruction should have provided that "if the defendant were *addicted* to crack cocaine," rather than "*under the influence* of crack cocaine." Defendant argues that the use of the latter phrase was confusing to the jury and laid out an incorrect standard under 21 U.S. C. §802(1), which defines an "addict" as

> [a]ny individual who habitually uses any narcotic drug . . . who is so far addicted to the use of narcotic drugs as to have lost the power of self control with reference to his addiction.

Where a defendant's ability to form the specific intent to commit a crime is at issue, it is appropriate to examine only evidence relating to the defendant's specific state of mind at the time of the charged offense. U.S. v. Cameron, 907 F.2d 1051, 1067 (11th Cir. 1990). The record here reveals that the trial court opted to use the phrase "under the influence" of cocaine because it wanted to make clear to the jury that a finding that a particular defendant was an addict did not permit the jury to automatically conclude that he or she would have been unable to form the specific intent necessary to engage in the conspiracy. Thus, the trial judge's instruction in this case was designed to appropriately narrow the jury's focus and we consequently conclude that its use did not constitute error.

AFFIRMED.