[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
JULY 5, 2006
THOMAS K. KAHN
CLERK

_____

No. 05-11260
Non-Argument Calendar
_____

D. C. Docket No. 04-00490-CR-T-TBM

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

ELIAS ABUSAID, JR.,
a.k.a. Lou,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Middle District of Florida

_____

**(July 5, 2006)**

Before CARNES, PRYOR  and FAY, Circuit Judges.

PER CURIAM:

Elias Abusaid, Jr., appeals his 97-month concurrent sentences, imposed after a jury convicted him following a trial, for one count of maintaining an establishment for the purpose of unlawfully distributing or using a controlled substance, a violation of 21 U.S.C. § 856(a)(2) and (b), and one count of possession of a firearm by a convicted felon, a violation of 18 U.S.C. § 922(g)(1) and § 924(a)(2). On appeal, he argues that the district court committed clear error when it calculated drug quantities for sentencing and that his sentence was imposed in violation of United States v. Booker, 543 U.S. 220, 125 S.Ct. 738, 160 L.Ed.2d 621 (2005). For the reasons set forth more fully below, we affirm.

Abusaid pled not guilty to both of the charges listed above, and after representing himself pro se with the assistance of back-up counsel, a jury found him guilty after an eight-day trial on both counts as charged in a superseding indictment. Following trial, a presentence investigation report (PSI) was filed, stating that undercover agents, officers, and confidential sources conducted 18 undercover operations within "AV-O2," Abusaid's club, and made controlled purchases of a total of 184 MDMA tablets. However, based largely on the trial testimony of Hoang Van Bui, a drug dealer at "AV-O2," and information provided by Martin Camano, Bui's "runner" inside the club, the PSI attributed a marijuana equivalency of 1,950 kilograms of MDMA (15,600 tablets) to Abusaid as to Count

2

1 for a base offense level of 32, pursuant to U.S.S.G. § 2D1.1(c)(4). The PSI based that calculation on a factual proffer Bui gave to Drug Enforcement Administration agents, indicating that he had sold approximately 200 MDMA tablets per weekend at AV-O2 over a year and a half (78-week) period. However, pursuant to § 2D1.8(a)(2), applicable to those who rent or manage a drug establishment, Abusaid's offense level could be no higher than 26 because he had no other participation in the underlying controlled substance offense than allowing the use of his premises, and the otherwise applicable four-level reduction would not provide for a lower offense level. Abusaid also received a two-level enhancement for obstruction of justice, pursuant to U.S.S.G. § 3C1.1, for a total offense level of 28. The calculations as to Count 2 are not relevant because Count 1 provided for the higher of the two total offense levels, even after a multiple count adjustment under U.S.S.G. § 3D1.4. Abusaid was found to be in criminal history category III, which at offense level 28, provided a recommended sentencing range of 97-124 months' imprisonment.

Abusaid filed several objections to the PSI, only two of which are relevant to this appeal. First, Abusaid challenged the credibility of Bui and argued that his trial testimony was unreliable. In a letter outlining his objections, Abusaid argued that Bui's claims and statements should be disregarded because: (1) Bui's trial

testimony was different from his testimony to a grand jury; (2) Bui had been examined by a doctor, who found that Bui's recent memory was impaired and that Bui suffered from "Reactive Attachment Disorder" (RAD), causing him to lie; and (3) Bui had filed a motion in his own criminal proceedings seeking a 10-level downward departure pursuant to U.S.S.G. § 5K2.0 because of "Severe Childhood Trauma, Extraordinarily Difficult Cultural Adjustment, and Resulting Reactive Attachment Disorder." Moreover, Abusaid argued that, during his cross-examination of Bui at trial, Bui had admitted that he wanted to be released and that the government held the key to his freedom. Based on Bui's alleged unreliability, Abusaid argued that the drug quantity attributed to him, based solely on Bui's trial testimony and not a special verdict form submitted to the jury, was incorrect and that he should be held accountable for less than 184 MDMA tablets.

Relevant to Abusaid's objections, Bui testified during Abusaid's trial, and admitted that he recently had been sentenced to 96 months' imprisonment for distribution of MDMA. Bui further admitted that he had several prior felony convictions and that his testimony was being offered in the hope that the government would move to reduce his sentence. Bui then identified Abusaid as the owner of AV-O2, and testified that he sold ecstasy at AV-O2 for approximately two years leading up to his arrest. Bui testified that when he first began selling

4

ecstasy at AV-O2, he was not the "main guy," but that after approximately one year, he became viewed as the primary drug distributor there.

On one occasion, Abusaid caught Bui conducting an obvious drug deal, and had him removed from the premises. Within a week, Bui returned to AV-O2, was never again told that he was unwelcome there, and continued to sell drugs there until his arrest. Bui testified that, on a good weekend, he could sell approximately 800 pills of ecstasy at $20-$30 per pill. In addition to drug dealings, Bui testified that he helped perform other duties at Abusaid's club, including helping with security at the front door, and, although Bui was not a paid employee, no one ever told him that his assistance was unwanted or unneeded. Bui also testified that he communicated with other employees of the club via two-way radios. For assistance, Bui relied on Martin Camano, whose responsibility, among other things, was to distribute ecstasy within the club.

Bui testified that, on three or four occasions, he gave Abusaid ecstasy pills free of charge, "like a gift," and, additionally, paid Abusaid $100 to $200 on about 10 occasions "to keep him off our back" and to "overlook some stuff that we do," specifically, selling ecstasy. Bui also paid other AV-O2 employees, mostly security guards. On occasion, Bui stated that he would be mistaken as the owner of the club because he had made a "name" for himself there, and was known as the

5

"bean man," meaning ecstasy dealer. On other occasions, people would show up at the front door specifically asking for Bui, which Bui learned from both security and Abusaid himself. Abusaid confronted Bui about people asking specifically for him and told Bui that it "doesn't look good" because people were showing up at AV-O2, purchasing drugs from Bui, and leaving the club without spending money at the club.

On cross-examination, Bui testified that, more than anything else, he wished to be out of jail. He further testified that, preceding his arrest for distributing MDMA, Bui sold 100 MDMA pills for $1,500 to a detective, and one week later, was contacted regarding a sale of 500 pills for $6,750. The last sale was never consummated because Bui was arrested. At the time of Bui's arrest, an additional 115 MDMA pills were discovered in his vehicle. Bui then stated that the U.S. Attorney's Office had "the key to the gate" that would permit Bui to go home. However, Bui testified that he did not have any belief or hope that he would be going home anytime soon.

As part of his sentencing, Abusaid included several exhibits relating to Bui, including Bui's grand jury testimony, in which he testified that he first began selling ecstasy outside of AV-O2 because it was a place that catered to ecstasy users. Initially, Bui was able to "move" a significant number of pills outside the

6

club in the parking lot. Within the year, Bui moved his sales inside the club, and former clients would approach him and introduce him to other people interested in purchasing pills. Bui testified that he tipped others in the club, including security and the "water girls," and occasionally provided free drugs to the employees. Bui testified that he "spent a lot of money at the club," and there were times when "one hand washes the other." Bui further testified that he gave Abusaid ecstasy pills two or three times. At its peak, Bui testified that he was selling between 300 to 400 pills a night at $20 to $30 per pill, and that he could sell 300 pills on a Friday night and sell nearly the same amount on Saturday night as well.

Also submitted was a motion for a downward departure, submitted by Bui at his own sentencing for distribution of MDMA, and seeking a 10-level downward adjustment based on severe childhood trauma, difficult cultural adjustment, and resulting RAD. In support of the motion, Bui was examined by a licensed social worker and found to be oriented to person, place, time, and his current situation, but his "recent memory" appeared to be "somewhat impaired." In short, Bui was diagnosed as suffering from RAD, which resulted in such difficulties as engaging in "intensive lying even when caught in the act" and "habitual dissociation," in which Bui often stated that he was "not sure what was real in his past and needed others to help substantiate it."

Based on the foregoing, Abusaid argued at his sentencing hearing that Bui's estimates of how many pills he distributed at AV-O2 should not be considered because Bui, based on the RAD diagnosis, suffered from impaired memory and diminished mental capacity. Abusaid further pointed out that Bui had sought a substantial downward departure based on his mental condition, and also argued that Bui's grand jury testimony conflicted with his trial testimony regarding the number of pills sold.

Abusaid further argued that Bui's grand jury testimony overestimated the amount of pills sold per night, as rebutted by other trial testimony. Next, Abusaid argued that Bui's grand jury testimony indicated that he was able to sell drugs outside the club, which he argued was contrary to a lawsuit Abusaid had filed to keep the Tampa Police Department from infringing on his parking lots and hurting his business—the inference being that, with such a large police presence, Bui could not have been as successful selling pills as he claimed to be. Abusaid then highlighted Bui's diagnosis and the accompanying symptoms, most notably the impaired memory and penchant for lying, and argued that Bui's recollection of events was not supported by other evidence at trial.

The court overruled Abusaid's objections to the drug quantity and found that testimony in the record and the jury's verdict supported the findings in the PSI.

8

The court further found that the believability of the witnesses could be inferred from the jury's verdict because the jury was responsible for evaluating the credibility of the witnesses and the weight to be afforded their testimony, and the jury's finding of guilt supported the PSI with regard to drug quantity. The court did, however, sustain Abusaid's objection to a two-level enhancement for obstruction of justice, pursuant to U.S.S.G. § 3C1.1, and, therefore, found that Abusaid's total offense level was 26. At offense level 26 and criminal history category III, the court found that the guidelines recommended a sentencing range of 78 to 97 months' imprisonment.

The court then noted that Abusaid had a lengthy history of criminal activity, indicating that, despite Abusaid's intelligence and skills, he repeatedly had chosen to become involved in activities detrimental to both himself and others in the community. The court noted that Abusaid's testimony at trial—that he was only providing water to people in his club—insulted the intelligence of the jury, and that, in reality, Abusaid had provided a facility for the operation of drug activity regardless of the negative effect it had on the people attending his club. The court found Abusaid's intelligence and representation of himself impressive, but noted that his intelligence made the criminal activity worse because it was clear that Abusaid was capable of making money in legitimate ways. Thus, based on a

9

review of the PSI, as modified by <u>Booker</u> to render the guidelines advisory only, the court, upon review of the factors set forth at 18 U.S.C. § 3553(a), sentenced Abusaid to 97 months' imprisonment and found that the sentence was sufficient, but not greater than necessary, to comply with the statutory purposes of sentencing.

## I. Drug Quantity

On appeal, Abusaid first argues that the district court erred by attributing a drug quantity to him based on the incredible testimony of Bui. Specifically, he argues that the government failed to prove, by a preponderance of the evidence, that Bui's challenged estimates were supported by reliable evidence, and submits that he never admitted to any specific amounts and no specific amounts were found by a jury. Next, Abusaid equates his situation to that of co-conspirators, and argues that the amounts specifically attributable to Bui should not be attributable to him because there was no evidence of joint undertaking or proof of an agreement to sell drugs to others. Thus, Abusaid argues that his offense level should be set on the basis of 184 pills, the number actually recovered from AV-O2 in this case.

At sentencing, the government bore the burden of establishing drug quantity by a preponderance of the evidence, and we will reverse only if the sentencing court's drug determination was made in clear error. <u>United States v. Matthews</u>, 168 F.3d 1234, 1247 (11th Cir. 1999). A defendant's base offense level is

determined by including "all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant." United States v. Mertilus, 111 F.3d 870, 873 (11th Cir. 1997); U.S.S.G. § 1B1.3(a)(1)(A).  Furthermore, "[w]here there is no drug seizure or the amount seized does not reflect the scale of the offense, the court shall approximate the quantity of the controlled substance."  U.S.S.G. § 2D1.1, comment. (n.12).  To the extent that Abusaid challenges Bui's credibility as a witness, we have held that the "credibility of a witness is in the province of the factfinder, and we will not ordinarily review the factfinder's determination of credibility."  United States v. Brown, 415 F.3d 1257, 1267 (11th Cir. 2005), cert. denied 126 S.Ct. 1570 (2006) (quotations and citation omitted).  As we have noted, "[w]e must accept the evidence unless it is contrary to the laws of nature, or is so inconsistent or improbable on its face that no reasonable factfinder could accept it."  United States v. Ramirez-Chilel, 289 F.3d 744, 749 (11th Cir. 2002) (citation omitted).

At the outset, we conclude that Abusaid's brief does not so much challenge the credibility of Bui as it does challenge the reliability of his testimony as evidence of the proper drug quantity.  The PSI, concluding that the amount of pills actually seized did not reflect the scale of the offense, used Bui's testimony and conservatively set a drug quantity by multiplying 200 pills per week by 78

11

weeks—the equivalent of one and a half years' sales—to arrive at 15,600 MDMA tablets sold. Bui's testimony at trial indicated that in one weekend, he was capable of selling approximately 800 pills at $20 to $30 per pill. Abusaid never impeached this testimony during his cross-examination, and, in fact, Bui's grand jury testimony indicated that he was selling between 300 and 400 pills per night on a weekend—300 on Friday and another 300 on Saturday—and these numbers do not contradict his trial testimony. In fact, the PSI used a more conservative number than the one Bui proffered at trial—200 pills per weekend—which is what he told Drug Enforcement Administration agents during a proffer agreement.

Moreover, while undercover officers may have purchased only 184 tablets during the course of their investigation, the most inculpatory evidence in this case was that Bui paid Abusaid, as well as some of his employees, in order to "overlook" his selling ecstasy and "keep him off our back." He further testified that Abusaid, on occasion, would tell Bui that certain individuals were looking for him, presumably to purchase ecstasy. This testimony, which Abusaid also never impeached on cross-examination, was believed by the jury, which convicted Abusaid of knowingly operating a facility for distribution of drugs. Bui's testimony was strong evidence of that guilt, and despite Bui's RAD, there is no reason to believe that Bui was lying about his drug sales. The district court made a

12

credibility determination in favor of Bui, and tempered that determination by using a lower, more conservative number than proffered at trial. Based on the foregoing, we conclude that the district court's factual findings were not clearly erroneous.

None of Abusaid's cited cases countenance a different conclusion. He relies most heavily on United States v. Lawrence, 47 F.3d 1559 (11th Cir. 1995). However, in Lawrence, the district court's only evidence was the information contained in the PSI and the government's brief proffer of evidence admitted by the defendants during their Rule 11 colloquies. 47 F.3d at 1568. Here, unlike in Lawrence, the district court had the benefit of an eight-day trial, replete with sworn testimony, most notably Bui's, on which to base its factual findings regarding drug quantity. See id. Moreover, Abusaid, unlike the defendants in Lawrence, explicitly was given the ability to test the reliability and accuracy of the information provided because he had the opportunity to cross-examine every witness, including Bui, during his trial. See id.

Furthermore, unlike the cases Abusaid cites, wherein a district court, when determining how many drugs are attributable to co-conspirators, "must first make individualized findings concerning the scope of criminal activity undertaken by a particular defendant," see, e.g., United States v. Ismond, 993 F.2d 1498, 1498 (11th Cir. 1993), individual findings are not mandated in this case because it is

undisputed that Abusaid was not indicted for conspiracy, did not conspire to distribute MDMA, and did not participate in the actual distribution. Abusaid, by receiving a base offense level of 26, pursuant to U.S.S.G. § 2D1.8(a)(2), was found to have no participation in the underlying controlled substance offense other than allowing use of his premises. However, by knowingly allowing use of his premises for drug distribution and receiving kick-backs or "tips" from Bui for doing so, there is no reason not to attribute to Abusaid the quantity of drugs sold on those premises, as the underlying controlled substance offense was the distribution of MDMA tablets, and Abusaid benefitted from the additional business those sales brought in.

Abusaid has offered no precedent supporting his argument that only 184 MDMA tablets should be attributed to him. Abusaid relies only on cases where a co-conspirator is improperly made liable for drugs sold (1) in furtherance of the conspiracy, or (2) that are known by the defendant or reasonably foreseeable to him. See, e.g., United States v. North, 900 F.2d 131 (8th Cir. 1990). As noted above, Abusaid has never been named as a co-conspirator, nor could he have been a co-conspirator and still be eligible for a base offense level of 26, pursuant to § 2D1.8(a)(2). See U.S.S.G. § 2D1.8(a)(2), comment. (n.1). He has cited no cases that support his interpretation of calculating drug quantity in the context of a

14

conviction for knowingly maintaining an establishment for the purpose of unlawfully distributing or using a controlled substance. Accordingly, we conclude that the district court's factual findings were not clearly erroneous on the record before it and that the district court's sentencing calculations were correct with respect to drug quantity.

## II. Booker

Next, Abusaid argues that the district court violated his Sixth Amendment right to a jury by enhancing his sentence on the basis of facts that were not found by a jury beyond a reasonable doubt or admitted by him, citing Booker. Abusaid argues that the district court based its sentencing enhancements with respect to drug quantity "on the word of witnesses of questionable motives" and that a jury should have determined the drug quantity before the court applied a sentencing enhancement based on the quantity. Thus, he argues that, because his enhancement was incorrectly applied, his sentence is unreasonable.

Where, as here, Abusaid failed to lodge a constitutional objection to his sentence on grounds that the district court improperly enhanced his sentence in violation of his Sixth Amendment right to a jury, we will review only for plain error. United States v. Rodriguez, 398 F.3d 1291, 1298 (11th Cir), cert. denied, 125 S.Ct. 2935 (2005). "An appellate court may not correct an error the defendant

15

failed to raise in the district court unless there is: (1) error, (2) that is plain, and (3) that affects substantial rights." Id. "If all three conditions are met, an appellate court may then exercise its discretion to notice a forfeited error, but only if (4) the error seriously affects the fairness, integrity, or public reputation of judicial proceedings." Id.

In Booker, the Supreme Court held that the mandatory nature of the Federal Sentencing Guidelines rendered them incompatible with the Sixth Amendment's guarantee of a right to a jury trial. Booker, 543 U.S. at 231-35, 125 S.Ct. at 749-51. In so doing, the Court reaffirmed its holding in Apprendi:[1] "Any fact (other than a prior conviction) which is necessary to support a sentence exceeding the maximum authorized by the facts established by a plea of guilty or a jury verdict must be admitted by the defendant or proved to a jury beyond a reasonable doubt." Id. at 244, 125 S.Ct. at 756. To remedy the Sixth Amendment violation inherent in sentencing enhancements based on judicial fact-finding, the Court, in a separate opinion, held that the guidelines were no longer mandatory and binding, advisory only. See id. at 259-60, 125 S.Ct. at 764-65.

Post-Booker, we have recognized two possible Booker errors at sentencing: "(1) the constitutional error of using extra-verdict enhancements to reach a

---

[1] Apprendi v. New Jersey, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000).

16

Guidelines result that is binding on the sentencing judge and (2) the statutory error of applying the Guidelines in a mandatory fashion." United States v. Cain, 433 F.3d 1345, 1347 (11th Cir. 2005). In the present case, neither error is applicable. We have held that, where a district court makes factual findings by a preponderance of the evidence that go beyond the letter of the charges in the indictment, it does not violate a defendant's constitutional rights so long as the guidelines are applied in an advisory fashion. See United States v. Chau, 426 F.3d 1318, 1324 (11th Cir. 2005). Here, the district court recognized that the guidelines were advisory only, and, therefore, any judicial factfinding was not binding on the judge and no constitutional error occurred. Moreover, because the court applied the guidelines in an advisory fashion, no statutory error could have occurred. Accordingly, there was no Booker error of any kind, plain or otherwise.

Based on the foregoing, we conclude that the district court did not clearly err when determining the drug quantity attributable to Abusaid and did not commit any Booker error. We, therefore, affirm.

**AFFIRMED.**