[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 11-15104
_____

D.C. Docket No. 1:99-cr-00804-CMA-12


UNITED STATES OF AMERICA,

Plaintiff-Appellee
Cross-Appellant,

versus


OSCAR VARELA GARCIA,
a.k.a. Omar Garcia Varela,
a.k.a. Capachivo,

Defendant-Appellant
Cross-Appellee.

_____

Appeals from the United States District Court
for the Southern District of Florida
_____

(September 18, 2013)

Before HULL and MARTIN, Circuit Judges, and HINKLE,[*] District Judge.

PER CURIAM:

After a jury trial, defendant Oscar Varela Garcia appeals, on sufficiency of the evidence grounds, his convictions for seven federal offenses. Garcia's convictions stemmed from his work as a high-ranking official in a Colombian drug trafficking organization. The government cross-appeals Garcia's total sentence, which was based on a downward variance, of 280 months as substantively unreasonable. After careful review, and with the benefit of oral argument, we affirm Garcia's convictions and sentences.

We begin by setting forth the case's procedural history up until the guilty verdicts. Afterwards, we recount the trial evidence, since Garcia's challenges pertain to the sufficiency of the evidence presented against him. We then address Garcia's appeals, explaining why, viewing the evidence in the light most favorable to the government, there was more than enough evidence for a reasonable jury to find Garcia guilty of the seven charged offenses. Afterwards, we turn to the government's cross-appeal. We describe in full the presentence investigation report ("PSI"), the sentencing hearing, and the downward variance. We explain why in light of the significant discretion we must give to a district court in the

---

[*]Honorable Robert L. Hinkle, United States District Judge for the Northern District of Florida, sitting by designation.

sentencing context, we cannot say that Garcia's sentence was substantively

unreasonable.

## I. PROCEDURAL HISTORY

### A.    Indictment

A federal grand jury in the Southern District of Florida returned a sixth

superseding indictment (the "indictment") against five defendants: Diego Montoya

Sanchez, Eugenio Montoya Sanchez, Garcia (the defendant in this appeal), and two

others (Herrera and Perea).

The indictment charged defendant Garcia with seven offenses: (1)

conspiracy to import five kilograms or more of cocaine into the United States, in

violation of 21 U.S.C. §§ 960(b)(1)(B) and 963 ("count one"); (2) conspiracy to

possess with intent to distribute five kilograms or more of cocaine, in violation of

21 U.S.C. §§ 841(b)(1)(A)(ii) and 846 ("count two"); (3) conspiracy to launder

monetary instruments, in violation of 18 U.S.C. §§ 1956(a)(1)(B)(i) and 1956(h)

("count three"); (4) conspiracy to obstruct justice, in violation of 18 U.S.C.

§§ 1503 and 371 ("count nine"); (5) obstruction of justice by torturing and

murdering a government witness in a pending federal prosecution, in violation of

18 U.S.C. §§ 1503(a), 1503(b)(1), 1111, and 2 ("count ten"); (6) conspiracy to

commit murder as retaliation for providing information to a law enforcement

officer, in violation of 18 U.S.C. §§ 1513(a)(1)(B), 1513(a)(2)(A), and 1111

3

("count eleven"); and (7) murder in retaliation for providing information to a law enforcement officer, in violation of 18 U.S.C. §§ 1513(a)(1)(B), 1513(a)(2)(A), 1111, and 2 ("count twelve").

## B.    Plea and Trial Rule 29 Motion

Garcia pleaded not guilty to all counts and proceeded to trial.  Meanwhile, each of his co-defendants pleaded guilty to some of the counts in the indictment. Afterwards, the district court held a seventeen-day jury trial in Garcia's case.

At the close of the government's case, Garcia made a motion for a judgment of acquittal under Rule 29(a) of the Federal Rules of Criminal Procedure as to each count.  The district court denied the motion as to each count except for count ten, the obstruction of justice by murder offense.  As to that count, it reserved ruling.[1]

## C.    Jury Verdict

Subsequently, the jury found Garcia guilty as to each count.  At sentencing, the district court denied Garcia's pending Rule 29 motion as to count ten.

## II.  TRIAL EVIDENCE ABOUT THE MONTOYA ORGANIZATION AND DEFENDANT GARCIA'S ROLE IN IT

---

[1]The district court reserved ruling on count ten because it needed time to do "some perusal of some law" regarding whether the charged offense could be based on conduct occurring outside the United States.  The district court subsequently determined that there was no extraterritorial application problem.

4

Because defendant Garcia challenges his convictions on sufficiency of the evidence grounds, we set forth in full the overwhelming evidence presented at trial.

## A.    The Montoya Drug Trafficking Organization

The trial evidence established that Garcia was a high-level official of a Colombian cocaine trafficking organization led by his co-defendant, Diego Montoya Sanchez ("Diego").[2]

Beginning by not later than 1986, Diego began selling cocaine that he produced at a coffee plantation near Cali, Colombia.  He soon formed an organization to grow, process, and ship cocaine to Mexico (the "Montoya organization").  From Mexico, a middle man smuggled the drugs into the United States.

Diego received assistance in this operation from his brothers, co-defendant Eugenio Montoya Sanchez ("Eugenio") and Juan Carlos Montoya Sanchez ("Juan Carlos").  Diego was the head of the organization, Eugenio oversaw the group's finances, and Juan Carlos was responsible for the cocaine shipments.  The organization also employed approximately 80 workers in its cocaine laboratories.

---

[2]During the trial, the witnesses, many of whom were former members of the Montoya organization, referred to defendant Garcia by his various nicknames, including: "Capachivo," "Capa," and "Don Omar."  For clarity purposes, we refer to the defendant as "Garcia," regardless of the name used by a testifying witness.

The Montoya organization was able to produce vast amounts of cocaine. A former lab worker testified that, at their peak, the organization's laboratories produced approximately 1,500 kilograms of cocaine in a single day.

Sometime around 1995, the Montoya organization stopped producing its own cocaine and began purchasing already processed cocaine and shipping the drugs to Mexico via boats. This business proved to be very lucrative. The Montoya organization shipped to Mexico about one or two boatloads per month of between 2,500 and 3,000 kilograms of cocaine. The organization received profits ranging from $7.5 million to $9.9 million per boatload. After the boats arrived in Guadalajara, Mexico, a middle man smuggled the cocaine into the United States.

The Montoya organization used an intricate procedure to ensure that the proceeds from these drug transactions were moved from the United States to Colombia without detection. We set forth the details of these measures in our discussion of Garcia's challenge to his money laundering conspiracy conviction.

## B.    Garcia's Entrance into the Montoya Organization

Defendant Garcia originally worked for another cocaine trafficking kingpin, Grajales, commonly referred to as "Don Ivan." During the 1980s and 1990s, Garcia worked as the head of security for Don Ivan, who owned a large Colombian estate called "Milan." There was an airstrip at Milan, which Don Ivan allowed his friend, Diego, to use for transporting cocaine. As Don Ivan's head of security,

6

defendant Garcia oversaw the team of 20 to 25 armed bodyguards working at the Milan estate.

In 1993, Don Ivan and his friend Diego instructed defendant Garcia to murder an employee of another Colombian drug kingpin, with whom Diego was in a dispute. Garcia successfully orchestrated the murder. After the rival drug kingpin agreed not to retaliate against Diego or Don Ivan, Diego became, as one witness stated, "the most important man within the North Valley Cartel." The witness explained that "making an attempt against the life of one of the members of the [rival] organization, he being a kingpin of the North Valley Cartel, that gave Diego a certain renown or a certain reputation within the North Valley Cartel."

Shortly thereafter, Don Ivan was arrested and imprisoned. At that point, Diego took over operation of the Milan estate. Also around that time, defendant Garcia, went to work exclusively for Diego, "in charge of the hit men and security." One witness testified that, as the organization's head of security, Garcia was "the most highly trusted in terms of murders and hit men activities."

## C.    Garcia's Role in the Montoya Organization

As the Montoya organization's security chief, defendant Garcia performed a number of functions. One of those was collecting drug debts. One of Garcia's top deputies testified that, often, the deputy could collect a debt by making a phone call to the debtor and mentioning Garcia's name. The deputy testified that he

7

would tell the debtor "I am one of . . . [Garcia's] workers."  After doing so, he would "get a lot of respect."  When a phone call did not work, Garcia kidnapped the debtor or the debtor's family members, and only released the victim after the debt was paid.  For example, in the mid-1990s, Diego lost $3 million when a shipment of cocaine profits was seized during transit from Miami to Colombia.  Diego summoned Garcia and ordered him to kidnap the individual in charge of supervising the shipment of the money as well as the person's family, and to not release the victims until the lost funds were repaid.  Garcia did so, and the debt was recovered thereafter.

Garcia also was responsible for retaliating against those who stole from the Montoya organization.  For example, approximately 1,500 kilograms of cocaine were stolen from Diego around 1994.  In response, Diego ordered defendant Garcia to kidnap, torture, and kill the people suspected of stealing the cocaine.  Garcia assembled a team of 14 workers to help him with the kidnappings, torture, and murders.  Some time later, Garcia reported to Diego that he had murdered some of the individuals responsible for the theft, and that he had recovered some of the stolen drugs.  Thereafter, Garcia reported to Diego again, this time telling the organization leader that he had murdered the head of the gang that had stolen the drugs.

8

Another one of Garcia's tasks was murdering members of a rival drug organization (led by Varela) after Diego declared "war" against the Varela organization in 2003. Around that time, Diego summoned a meeting of Garcia and a few of his other workers. Diego instructed his employees to gather a group of men together for "war" with the Varela organization. Garcia suggested that the group be called "Los Machos" because the men were "really tough guys . . . . really macho." Afterwards, Diego developed a list of the rival organization's members whom he wanted killed. Diego offered to pay Garcia a bounty for each person on the list killed. The price of the bounty depended on the target's importance in the rival organization.

Garcia then went about killing the members on the list. Garcia frequently updated Diego on whom he and his men had killed. A witness testified that Garcia would not personally carry out these murders; rather, he "had others whom [he and his top deputies] would send out to do the killings." Afterwards, the workers would report back to Garcia "[a]bout the people that they had killed." Garcia received "a significant amount of money" after his workers killed Varela's cousin, "Porras," a high-ranking official in the Varela organization.

Another one of Garcia's important roles was murdering members of the Montoya organization suspected of being informants. Diego was very concerned about the possibility that members of his organization might betray him.

9

According to one witness, Diego "would say something like 'These snitching sons of bitches need to be killed.  Anyone who comes out as a snitch, I will have them killed.'"  Garcia was responsible for ensuring that Diego made good on that threat.

We discuss in detail below one the murders of an informant orchestrated by Garcia.  However, Garcia orchestrated several others.  Evidence at trial showed that Garcia was responsible for the murders of at least seven members of the Montoya organization suspected of being informants, three of whom were the brothers of Montoya's top deputy.  After at least one of these murders, Garcia's workers dismembered the victim's body and dumped it into a river in order to conceal it.

Diego compensated defendant Garcia for this work.  Prior to the 2003 war with the rival drug organization, Diego paid Garcia between $3,000 and $5,000 for each murder Garcia completed or arranged to be completed.  After the outbreak of the war, Diego began paying Garcia a monthly salary of approximately $500,000, which Garcia shared with the men working for him.  Additionally, he paid Garcia a bounty for certain members of the rival organization that Garcia killed.  Also during the war, Diego and his brothers began to pay Garcia "stakes," or portions of the profits from their cocaine trafficking activities.  A witness testified that Garcia received a payment of $700,000 from the shipment of one 200 kilogram load of cocaine.

10

### III.  TRIAL EVIDENCE ABOUT THE MURDER OF AN FBI INFORMANT

Counts nine through twelve pertained to Garcia's role in murdering a member of the Montoya organization who was cooperating with United States law enforcement officers investigating the organization.  Thus, we recount in detail the evidence pertaining to that murder.

### A.    Background on the Montoya Organization's Miami Operations

In the late 1990s, three members of the Montoya family (the mother of the Montoya brothers, their sister, and Diego's ex-wife) moved to Miami, Florida.  Around that time, one of Diego's employees, Cardona, also moved to Miami.  While living in Miami, Cardona assisted Montoya family members living in the United States.  Cardona bought apartments for the family members to live in, obtained cars for them to drive, and managed an off-shore bank account funded by the Montoya brothers for their family members' expenses in the United States.

In June 2002, based on information provided by Colombian police, American FBI agents identified Cardona as the Montoya organization's operative in the United States.  At that time, an FBI agent confronted Cardona in a parking lot in Miami and showed him evidence the FBI had gathered about the Montoya organization.  Cardona reviewed the extensive evidence already compiled and agreed to assist the FBI's efforts to obtain more details.

### B.    The Victim Giraldo's Cooperation with Federal Agents

11

After Cardona began informing on the Montoya organization, the FBI agents asked him whether he knew of any organization member in Colombia who might also be willing to assist American authorities. Cardona responded that his long-time friend, Jhon Jairo Garcia Giraldo ("Giraldo"), might be amenable to helping the FBI.

At trial, Cardona described Giraldo as his "best friend" and stated that he had met Giraldo when both were nine years old. In 1996, Giraldo was working for a cellular phone company in Colombia when Cardona introduced him to the Montoyas. Giraldo became friends with the Montoya brothers, and entered into a business relationship with them whereby he provided them with cellular equipment.

Giraldo agreed to cooperate with the FBI. Giraldo traveled to Miami where he met with the federal agents in September 2002. During that meeting, Giraldo informed the agents of important locations for the Montoya organization's drug trafficking work and of the identities of high-ranking members of the organization. Giraldo also discussed with the agents ways he could help them catch Diego. Afterwards, Giraldo returned to Colombia.

Giraldo traveled to Miami again on June 8, 2003. He did so because the Montoya brothers had ordered him to deliver $15,000 to Diego's ex-wife, who lived in Miami. Cardona picked Giraldo up at the Miami airport and immediately

12

took him to meet with FBI agents at a hotel.  While in the agents' presence,

Giraldo contacted Montoya organization members in Colombia to confirm that he

had arrived safely and to receive instructions on how to deliver the money.

Giraldo learned that a meeting was scheduled for later that day at his hotel.  The

agents then photographed the cash and surveilled the transaction.

## C.    Preparations to Torture and Murder Giraldo

A few weeks later, on July 4, Giraldo returned to Colombia.  Around that

time, Diego learned about Giraldo's cooperation with the American officials.  As a

result, Diego and his brothers decided to torture and kill Giraldo.

After becoming aware of Giraldo's actions, Eugenio summoned defendant

Garcia and one of Garcia's top deputies, Robayo, to a meeting in Cali, Colombia.

At trial, Robayo testified about the meeting.  Robayo stated that Eugenio instructed

him and Garcia to "torture [Giraldo] and . . . get some information out of him,

information that we need."  The needed information pertained to "what type of

information [Giraldo] was providing to the Americans."  Robayo testified that he

understood Eugenio as impliedly instructing them to murder Giraldo because

informants who are tortured "have to be killed."

After Robayo and Garcia met with Eugenio they discussed between

themselves how to kill Giraldo.  Garcia directed Robayo to personally oversee the

13

torture and killing of Giraldo, and gave Robayo specific directions on how to do so.

Garcia advised Robayo to take with him for the torture and murder two of his (Garcia's) family members known as "Los Locos" or "the crazy ones." According to Robayo, Garcia suggested that these men would be useful because they "were good for torturing and they were good to dismember the bodies . . . they were special in that." As for how to torture Giraldo, Garcia told Robayo to "break his shins because that is quite effective." Garcia advised that, after Robayo broke Giraldo's shins, he should "[w]ait about 30 or 40 minutes . . . and put pressure there . . . . squeeze that area there and then that will work." Garcia also told Robayo to murder Giraldo after getting information from him and then to "cut him up and dismember him so that he disappears." Robayo testified that he followed these instructions because Garcia was his "boss" and he "had to do what he told me to."

## D.    Giraldo's Murder

On a preselected day, Robayo lured Giraldo to another Montoya organization member's farm by requesting that Giraldo deliver cellular telephones there. When Giraldo arrived, Robayo and his assistants grabbed and handcuffed him, and then led him to a stable, where they sat him on a stool.

14

Once everyone was in the stable, Robayo excused his assistants and spoke to Giraldo privately. Robayo advised Giraldo that he (Giraldo) was "in trouble" and that Robayo would "help [him] out" if Giraldo answered Roabyo's questions truthfully. Despite Robayo's offer of assistance, Giraldo denied providing information to the DEA or the FBI. Giraldo suggested that it was Diego's wife (who lived in Miami) who was talking to the American authorities. After four or five minutes, Robayo stepped outside of the stable and told his assistants "he has to be tortured. He doesn't want to talk."

The group reentered the stable, stripped Giraldo to his underwear and tied his hands behind his back. One of the men beat Giraldo with a baseball bat and "broke his leg with several blows." Robayo testified that, while the beating occurred, Giraldo "was screaming. He made a real racket." Giraldo still refused to admit to betraying the Montoya organization.

Following Garcia's instructions, Robayo waited about 40 minutes and then squeezed Giraldo's broken leg. Robayo also placed a hood over Giraldo's head and dunked his head in a container of water. At another point, the men broke Giraldo's other leg and squeezed it. Despite enduring such pain, Giraldo refused to confess.

15

After "[h]ours" of torture, Robayo decided "to kill him."  The men murdered Giraldo by placing a bag over his head and thus asphyxiating him.  Afterwards, they dismembered Giraldo's body and threw the parts into a nearby river.

### E.    Reports to Garcia About the Torture and Murder

Although Garcia was not at the farm during the torture and murder, he kept close tabs on the events.  Robayo testified that Garcia called him twice while he was torturing Giraldo.  The conversations were short, according to Robayo, "because [Robayo] was busy."

Later on, Robayo met with Garcia in person.  Garcia asked Robayo: "How did you do?"  To which Robayo replied: "So-so.  You know, that customer didn't have much to say."  Garcia asked Robayo specific questions about the torture methods used.  He asked: "Did you hit him on the shins like I told you?"  Garcia assured him: "We did everything to him."

Garcia also developed a plan to ensure that Colombian law enforcement authorities could not link the Montoya organization to Giraldo's murder.  He instructed Robayo to take Giraldo's car and "dump [it] at a location somewhere where the guerrillas are nearby . . . .  So if something comes up, it would look as if the guerrillas had kidnapped him."  Robayo disposed of the car just as Garcia instructed.

### F.    Garcia's Reports to the Montoya Organization About the Murder

16

Once Garcia learned that his workers had carried out the torture and murder, Garcia reported to his superiors within the Montoya organization. A former Montoya organization employee testified that, at a meeting attended by Diego and Eugenio, Garcia discussed killing and torturing Giraldo.

The Montoya brothers were pleased that Garcia had arranged for Giraldo's death. Diego said to the former employee: "We have killed that son of a bitch snitch." Eugenio gave credit to Garcia for carrying out the murder. However, at a subsequent meeting among Diego, Robayo, and Garcia, Robayo told Diego he believed that Giraldo was actually innocent of being an informant for the U.S. government. This statement angered Diego. Garcia intervened on Robayo's behalf, stating, "Diego, everything was done to him. Believe us, if he did not talk, it was because he was not guilty."

## G.    The Cover-up of the Murder

One of the Montoya organization members who helped in Giraldo's torture and murder kept Giraldo's cellular telephone and used the phone to place calls. As a result, Colombian law enforcement authorities investigating Giraldo's disappearance identified the Montoya organization member as a suspect.

In response, Garcia and Robayo arranged to bribe Colombian officials. Garcia also ordered Robayo to murder the person who had kept the telephone, which Robayo did.

17

## IV.  STANDARDS OF REVIEW FOR GARCIA'S APPEAL

Garcia challenges each of his seven convictions on sufficiency of the evidence grounds.  "We review de novo whether there is sufficient evidence to support a jury's verdict in a criminal trial."  United States v. Doe, 661 F.3d 550, 560 (11th Cir. 2011).  In performing this review, we view the evidence in the light most favorable to the government, and we resolve all reasonable inferences and credibility determinations in favor of the guilty verdict.  Id.

Evidence is sufficient to support a conviction if a reasonable jury could find that the evidence established guilt beyond a reasonable doubt.  United States v. Beckles, 565 F.3d 832, 840 (11th Cir. 2009).  We will not vacate a conviction on sufficiency of the evidence grounds when a defendant does nothing more than put forth "a reasonable hypothesis of innocence."  Id.  This is because "the issue is not whether a jury reasonably could have acquitted but whether it reasonably could have found guilt beyond a reasonable doubt."  Id. at 840–41 (internal quotation marks omitted).

With these standards in mind, we address each of Garcia's challenges to his convictions, starting with his argument about counts one and two—the drug conspiracy counts.

## V.  SUFFICIENCY OF THE EVIDENCE – COUNTS ONE AND TWO

### A.    Elements of the Drug Conspiracy Offenses

Garcia first challenges his convictions on counts one and two, the drug conspiracy counts.  On count one, the jury convicted defendant Garcia of conspiring to import five kilograms or more of cocaine into the United States, in violation of 21 U.S.C. § 960(b)(1)(B), the substantive object offense statute, and § 963, the conspiracy offense statute.  To support a conviction under § 963, the government needed to prove "beyond a reasonable doubt that there existed an agreement between two or more persons to import narcotics into the United States and that [Garcia] knowingly and voluntarily participated in that agreement." United States v. Arbane, 446 F.3d 1223, 1228 (11th Cir. 2006).

As for count two, the jury convicted defendant Garcia of conspiring to possess with intent to distribute five kilograms or more of cocaine, in violation of 21 U.S.C. § 841(b)(1)(A)(ii), the substantive object offense statute, and § 846, the conspiracy offense statute.  "To sustain a conviction for conspiring to distribute narcotics," we consider whether there was sufficient evidence to establish the following elements: (1) "an agreement existed between two or more persons to distribute the drugs"; (2) "the defendant . . . knew of the conspiratorial goal"; and (3) "he knowingly joined or participated in the illegal venture." United States v. Matthews, 168 F.3d 1234, 1245 (11th Cir. 1999).

On both offenses, "[t]he government [did] not have to prove that [Garcia] knew all of the details of the conspiracy or that he participated in every phase of

19

the scheme." United States v. Guerrero, 935 F.2d 189, 192 (11th Cir. 1991).

Moreover, a defendant's knowing participation may be established "through proof

of surrounding circumstances, such as acts committed by the defendant that

furthered the purpose of the conspiracy." Id.

## B.    Evidence in Support of Conviction

Garcia concedes the first elements on both offenses—that two or more

members of the Montoya organization agreed to import or distribute cocaine to the

United States.  Additionally, there was testimony about multiple actions that

Garcia knowingly took in furtherance of this conspiracy.  Garcia contends that

there was insufficient evidence that he knowingly joined the conspiracy, knowing

of its goal.  He is wrong.  There was ample evidence for a reasonable jury to

conclude that Garcia knew the Montoya organization's goal of exporting cocaine

to the United States.

First, multiple witnesses testified about the close relationship between

Garcia and the Montoya organization's leader, Diego.  For example, Sanchez, a

cousin of the Montoya brothers who spent most of his life working for the

Montoya organization, testified at trial that after Garcia coordinated the murder of

the rival drug organization member, "the friendship was consolidated more

between [Garcia] and Diego Montoya."  Likewise, Garcia's former assistant,

Robayo, testified that Garcia met with Diego frequently and "was a very important

20

individual . . . for Diego."  He stated that Diego and Garcia "were close and they had a trusting relationship."  Upon seeing each other, Diego and Garcia would offer warm greetings and hug.  A reasonable jury could infer from the evidence about the close relationship between Diego and Garcia that Diego shared with Garcia details about the Montoya organization's drug distribution activities.  In fact, it is difficult to imagine that Garcia could have been so close to Diego, and yet Diego withheld from Garcia fundamental facts about the field in which they both labored.

Additionally, there was ample evidence about the drug debt collection work that Garcia did for the Montoya organization.  For example, a former Montoya organization member, Perez, testified that Garcia had primary responsibility for collecting the organization's drug debts.  Likewise, Robayo provided details about the "trafficking debt" collection measures that he and defendant Garcia undertook.  Robayo stated that he could simply make a phone call and state that he was one of "[defendant Garcia's] workers" and prompt the debtor to pay the sum owed.  A reasonable jury could infer that Garcia knew the source of the debts he collected— the organization's cocaine trafficking.  Again, it is unfathomable that Garcia could have spent more than a decade collecting debts for a sophisticated drug trafficking organization without knowing that the debts were owed for shipments of cocaine to the United States.

21

There was more evidence, though.  Multiple witnesses testified about the significant sums of money Garcia earned from his work for the Montoya organization.  Robayo testified that, once the Montoya organization went to "war" with its rival (sometime around September 2003), Diego started to give Garcia $50,000 per month.  Former organization member Perez stated that defendant Garcia kept close track of the organization's finances because "as soon as the money would come in, then [enforcers like Garcia] would get paid right away for the crimes that they had committed and whatever money was owed them."  Perez explicitly stated that the money being used to pay Garcia came from "[d]rug trafficking."  Perez also testified that the "final destination" of the drugs generating this money "was the U.S."  A reasonable jury could infer that Garcia knew the source of the large sums of money he was receiving—the organization's drug shipments to the United States.

In short, there was more than enough evidence for a reasonable jury to conclude that defendant Garcia knew the conspiracy's unlawful purpose of sending drugs to the United States.  Accordingly, we affirm his convictions on counts one and two.[3]

---

[3]In opposition to this conclusion, Garcia cites cases from this Court where we have vacated conspiracy convictions on sufficiency of the evidence grounds.  However, these cases involve very different facts than we have here.  See United States v. Johnson, 440 F.3d 1286, 1294–96 (11th Cir. 2006) (vacating money laundering conspiracy conviction); United States v. Charles, 313 F.3d 1278, 1283–87 (11th Cir. 2002) (vacating convictions for conspiracy to

## VI.  SUFFICIENCY OF THE EVIDENCE – COUNT THREE

### A.    The Money Laundering Conspiracy Statute

Next, Garcia challenges the sufficiency of the evidence as to his count three conviction for conspiring to launder money.  To convict Garcia for conspiring to commit money laundering under 18 U.S.C. § 1956(h), the government needed to show: (1) that an agreement existed between two or more persons to commit a money laundering offense, as set forth in 18 U.S.C. § 1956 or § 1957; and (2) that Garcia knowingly and voluntarily joined in or participated in the conspiracy.  See United States v. Silvestri, 409 F.3d 1311, 1328 (11th Cir. 2005); see also 18 U.S.C. § 1956(h).  The government did not need to prove the commission of an overt act to obtain a conviction under the statute.  See Whitfield v. United States, 543 U.S. 209, 214, 125 S. Ct. 687, 691 (2005).   Moreover, the government could rely on circumstantial evidence to prove the conspiracy's existence.  United States v. Kennard, 472 F.3d 851, 856 (11th Cir. 2006).  Additionally, the government

possess with intent to distribute cocaine and conspiracy to carry a firearm in furtherance of that crime where evidence established only that defendant knew of plan to commit a home invasion robbery, not that the goal of the robbery was to steal narcotics); United States v. Martinez, 83 F.3d 371, 374 (11th Cir. 1996) (vacating conviction for conspiracy to possess cocaine with intent to distribute where the evidence established that co-conspirator told defendant that the conspiracy was to steal money and there was no evidence that defendant knew actual goal of conspiracy was to steal cocaine).  In fact, in one of the cases Garcia relies on, we did not vacate a conspiracy conviction at all; rather, we vacated a defendant's sentence because the district court misapplied the conspiracy guideline.  See United States v. Hernandez, 141 F.3d 1042, 1051–57 (11th Cir. 1998) (vacating defendant's sentence for multi-object conspiracy offense when district court had determined sentence based on offense level of one object offense, committing murder-for-hire, and there was insufficient evidence for a reasonable jury to convict defendant of conspiring to commit murder-for-hire).  In any event, the mere fact that this Court has in the past vacated a conspiracy conviction does not give us reason to do so here.

needed only to prove that Garcia knew the conspiracy's essential money laundering objective, not that he knew specific details about the conspiracy. See id.

## B.    Elements of the Object Offense

The jury found Garcia guilty of conspiring to commit the money laundering offense set forth in 18 U.S.C. § 1956(a)(1)(B)(i).[4] The elements of a violation of § 1956(a)(1)(B)(i) are: (1) "the defendant conducted or attempted to conduct a financial transaction"; (2) "the transaction involved the proceeds of a statutorily specified unlawful activity"; (3) "the defendant knew the proceeds were from some form of illegal activity"; and (4) "the defendant knew a purpose of the transaction was to conceal or disguise the nature, location, source, ownership, or control of the proceeds." United States v. Miles, 290 F.3d 1341, 1355 (11th Cir. 2002).

As for the first element, a "financial transaction" is, inter alia, "a transaction which in any way or degree affects interstate or foreign commerce . . . involving the movement of funds by wire or other means." 18 U.S.C. § 1956(c)(4). The term "transaction" refers to "a purchase, sale, loan, pledge, gift, transfer, delivery, or other disposition . . . of currency." Id. § 1956(c)(3). We previously have noted

---

[4]That provision states: "[w]hoever, knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity . . . knowing that the transaction is designed in whole or in part . . . to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity" shall be guilty of a felony offense. See 18 U.S.C. § 1956(a)(1)(B)(i).

that these definitions indicate "that Congress intended to criminalize a broad array of transactions designed to facilitate numerous federal crimes." United States v. Adams, 74 F.3d 1093, 1102 (11th Cir. 1996) (internal quotation marks and citation omitted).

On the second required element, the statute provides that a "specified unlawful activity" includes "the manufacture, importation, sale, or distribution of a controlled substance." 18 U.S.C. § 1956(c)(7)(B)(i). "Proof that the funds were drug proceeds may be established by circumstantial evidence." United States v. Frazier, 605 F.3d 1271, 1282 (11th Cir. 2010).

To prove the third element—that that defendant knew the illegal character of the transferred funds—"[c]ircumstantial evidence may be used to prove a defendant knew the funds were drug proceeds." Id.

As for the fourth, "concealment" element, the government did not need to prove that Garcia was trying to conceal the "the illegal nature of the funds"; rather, the government needed only to prove that Garcia concealed "the location of the [illegal] money." United States v. Elso, 422 F.3d 1305, 1309 n.7 (11th Cir. 2005). This Court previously has noted evidence relevant in determining whether a transaction's purpose was to conceal the location of illegal funds, including, inter alia: (1) "statements by a defendant probative of intent to conceal"; (2) "unusual secrecy surrounding the transaction"; (3) "highly irregular features of the

transaction"; (4) "using third parties to conceal the real owner"; and (5) "a series of unusual financial moves cumulating in the transaction." United States v. Johnson, 440 F.3d 1286, 1291 (11th Cir. 2006) (internal quotation marks omitted). Also relevant to this element is "whether the money is better concealed or concealable after the transaction than before." Id. (internal quotation marks omitted).

**C.    Evidence That Members of the Montoya Organization Conspired to Commit Money Laundering – Shipment of Cash to Colombia**

There was more than enough evidence that two or more members of the Montoya organization conspired to commit the object offense of money laundering, as set forth in 18 U.S.C. § 1956(a)(1)(B)(i).

The government's evidence included details about the money laundering operation that the Montoya organization used to move from the United States to Colombia the proceeds of its drug trafficking. Specifically, Perez, who served as the secretary for Eugenio Montoya (the brother responsible for the organization's finances) described this process in detail.

Perez stated that: (1) American purchasers would deliver money to a middle man, Arturo Beltran, located in Mexico ; (2) an intermediary between Beltran and the Montoya organization, "Gogo," (also operating from Mexico) would contact Beltran and arrange to receive the money from him; (3) after receiving the money, Gogo would transfer it to yet another middle man, "Pirana," who would arrange to have it shipped to Colombia via "airlines"; (4) once the money was in Colombia,

26

Gogo would transfer it to a Montoya organization representative, either "Marbel" (located in Cali) or "Villegas" (located in Bogota); (5) Marbel or Villegas would then place the money in locations, referred to as "stash places"; (6) the recipient of the money would give a report to Eugenio Montoya; (7) the Montoya brothers would confer and decide what to do with the new funds, including paying debts, distributing money to organization members, or spending the money to fund their own lifestyles; (8) Diego would then give instructions to the individuals responsible for disbursing the money, including, among others, Villegas; and (9) once they disbursed the money from these stash houses, these individuals would report to Eugenio. According to Perez, this whole process involved shipments of American currency, usually in amounts ranging between $15 million and $25 million.

Based on this testimony, a reasonable jury could conclude that Montoya organization members conspired to commit money laundering, as set forth in 18 U.S.C. § 1956(a)(1)(B)(i). First, the process of moving the drug proceeds from the United States to Colombia involved multiple "financial transactions" as defined in the statute. The money moved from: (1) American purchasers to Beltran; (2) Beltran to Gogo; (3) Gogo to Pirana; (4) Pirana to the Montoya organization members; and (5) from the Montoya organization to various payees. Each transfer of money undoubtedly affected interstate or foreign commerce. Next, the

27

testimony made clear that the money being transferred was the proceeds of a specified unlawful activity—drug trafficking.  Third, the testimony also left little doubt that all participants in the operation knew the money's illegal character.

Fourth, there was sufficient evidence for a reasonable jury to conclude that the Montoya organization members carefully orchestrated the multi-step process in order to conceal the location of the drug proceeds.  The scheme involved a series of unusual transactions, involving three different middle men and the movement of money from the United States, to Mexico, and then to Colombia.  Additionally, once the money arrived in Colombia, Montoya organization members placed it in concealed "stash places."  Particularly telling was the fact that the organization carried on these complicated, high value transactions entirely in cash, which a reasonable jury could assume it did in order to avoid leaving evidence of the transactions.  Without a doubt, at the end of this process, the funds were "better concealed . . . than before."  See Johnson, 440 F.3d at 1291.[5]

---

[5]We recognize that this conduct might be more appropriately charged under subsection (a)(2) of the federal money laundering statute, which prohibits, inter alia, "transport[ing] . . . funds from a place in the United States to or through a place outside the United States . . . with the intent to promote the carrying on of specified unlawful activity."  18 U.S.C. § 1956(a)(2)(A). However, the indictment did not charge defendant Garcia with conspiring to commit this object money laundering offense; it charged him with conspiring to commit the money laundering offense discussed above.  Moreover, the district court's jury instructions referred only to subsection (a)(1).  Thus, the jury convicted Garcia of conspiring to commit the offense set forth in subsection (a)(1), not the one set forth in subsection (a)(2).  We therefore review the sufficiency of the evidence as to the offense for which Garcia was actually convicted, not other offenses which he could have been convicted of.

28

**D.    Evidence That Members of the Montoya Organization Conspired to Commit Money Laundering – Purchases in Miami, Florida**

Although the government argued at trial that the evidence just discussed supported the money laundering conspiracy conviction, on appeal the government contends that other evidence also could lead a reasonable jury to find that the Montoya organization conspired to commit money laundering.  This evidence was the testimony of Montoya organization member Cardona.

As discussed, the Montoya organization sent Cardona to live in Miami, where he assisted various members of the Montoya family living there.  Upon arriving in Miami, Cardona made purchases on behalf of the Montoya brothers, using money provided by the Montoya brothers.

For example, Cardona helped the family members purchase a condominium located on Williams Island costing approximately $750,000.  For the $150,000 down payment, he used money that the Montoya organization transferred from Mexico into a Miami attorney's escrow account.  Cardona told the attorney that the Montoyas "were businessmen in sugar cane," and did not reveal that they were cocaine traffickers.

Cardona also helped the Montoyas acquire a second apartment, this one located in Miami Beach, Florida.  This apartment cost between $450,000 and $500,000, and Cardona received the money for the down payment through a similar process as with the other condominium purchase.

29

Additionally, Cardona testified that he established an off-shore corporation, 2101 Limited, and opened an off-shore bank account for that corporation. He used the corporation's bank account "[t]o make the payments on the apartment loans and to cover the expenses of the Montoya family."

Not only did Cardona buy the family members condominiums, he also purchased a Lincoln Navigator automobile for Diego's wife. He purchased the car with $40,000 of Montoya organization money that he brought with him from Colombia after Marbel, a keeper of a "stash place" gave it to him there. To get this money into the United States, Cardona declared it as "money from [his] company." Similarly, Cardona purchased a BMW M3 vehicle for Diego's (approximately) 16-year-old son. Cardona obtained from the Montoya organization the $60,000 needed to purchase this car. An organization member made a wire transfer from Mexico into the off-shore account of Montoya's corporation, and then the corporation issued a draft to the car dealership.

A reasonable jury could conclude that Cardona's actions in Miami constituted money laundering under subsection (a)(1) of the federal money laundering statute. The evidence established that Cardona completed multiple transactions using Montoya organization funds.

In light of the ample evidence regarding the Montoya organization's drug trafficking activities, a reasonable jury could easily conclude that this money came

from the drug trafficking business.  Additionally, Cardona himself testified that some of the money came directly from Marbel, one of the organization members involved in the financial operations.  Moreover, a reasonable jury could infer that Cardona, an employee of the Montoya organization, knew the illegal character of the funds.

As for the concealment element, the Montoya organization took multiple steps to conceal the location of the funds Cardona used in Miami.  For example, the organization: (1) wired funds from Mexico, rather than directly from Colombia; (2) used the escrow account of an attorney; and (3) had Cardona establish an off-shore bank account under the name of a shell corporation for the purpose of receiving funds.  Further, Cardona lied about the Montoya organization's enterprise.

This evidence, in addition to the evidence about the cash shipments to Colombia, provides ample support for the conclusion that the Montoya organization conspired to commit money laundering, as set forth in 18 U.S.C. § 1956(a)(1)(B)(i).

## E.    Evidence That Garcia Knowingly and Voluntarily Joined or Participated in the Money Laundering Conspiracy

As for the second element, there was also sufficient evidence for a reasonable jury to find that defendant Garcia knowingly and voluntarily participated in the Montoya organization's money laundering operations.

31

As discussed, Perez testified that Garcia frequently questioned him about the organization's money laundering operations.   Perez stated that defendant Garcia asked him "[h]ow were we doing as far as money went.  He was always addressing matters that had to do with money, the financial aspect."  Garcia did so because when drug profits arrived in Colombia, portions were often given to Garcia. Royabo testified that Garcia was responsible for then taking those profits and distributing them to the organization members who worked directly for him. Therefore, the evidence showed that Garcia played a crucial role in the organization's financial operations—he distributed the concealed illegal proceeds of drug transactions to the organization's employees as payment for their work.

Moreover, on this second element, the government did not even need to prove that Garcia actively participated in the conspiracy.  The second element required the government only to prove that defendant Garcia knowingly joined the conspiracy.  See Silvestri, 409 F.3d at 1328.  There was extensive evidence that Garcia joined the Montoya organization.  Moreover, there was testimony that Garcia knew about the organization's financial operations.  Thus, a reasonable jury could conclude that Montoya knowingly joined the conspiracy to launder money, as money laundering was central to the Montoya organization's financial dealings.

Garcia contends that the evidence of the Florida-based transactions cannot support his conviction because "Cardona did not identify Mr. Garcia or claim that

he, Cardona, had <u>any</u> discussions with Mr. Garcia about any of the purchases or other financial transactions he was involved in with any of the Montoyas." Whether Montoya knew specifically about the Florida-based money laundering operation is not dispositive.  Importantly, Garcia did not need to know details about the methods the Montoya organization used to launder money, so long as he was aware of the money laundering objective.  See <u>Kennard</u>, 472 F.3d at 856. There was more than enough evidence for a reasonable jury to conclude that Garcia was so aware.

Garcia also argues that the evidence of the shipments of cash to Colombia was insufficient to convict him under § 1956(h) because these activities took place largely outside the United States, and that particular subsection does not expressly state its extraterritorial effect.  Be that as it may, Garcia ignores subsection (f) of the statute, which provides: "There is extraterritorial jurisdiction over the conduct prohibited by this section if—(1) the conduct is by a United States citizen, or, in the case of a non-United States citizen, the conduct occurs in part in the United States; and (2) the transaction or series of related transactions involves funds or money instruments of a value exceeding $10,000."  18 U.S.C. § 1956(f).

33

The requirements for extraterritorial jurisdiction were met here.  The evidence showed that the transferred funds originated in the United States.[6]  Thus, a portion of each transaction occurred in the United States.  Second, the evidence showed that the transactions routinely involved amounts equal to or in excess of $15 million, well above the statutory $10,000 threshold.  Even if there was not extraterritorial jurisdiction over the cash shipments to Colombia, there is no dispute that the transactions in Miami completed by Cardona are punishable in American courts.

Therefore, Garcia is wrong in arguing that the evidence regarding money laundering activities that happened outside the United States could not support his money laundering conspiracy conviction.  We affirm this conviction.

## VII.  SUFFICIENCY OF THE EVIDENCE – COUNTS NINE AND TEN

Next, Garcia challenges the sufficiency of the evidence as to his convictions on counts nine and ten for conspiracy to obstruct justice (count nine) and obstruction of justice (count ten).  Again, there was sufficient evidence for a reasonable jury to convict defendant Garcia of these offenses.

### A.    Elements of Conspiracy to Obstruct Justice and of Obstruction of Justice

---

[6]Admittedly, Perez did not recall who was responsible for getting the money from the American purchasers to the Mexican middle man, Beltran.  However, this does not negate the fact that the movement of the money from the United States to Mexico was an integral part of the overall money laundering operation.

34

Count nine charged defendant Garcia under the general conspiracy statute, 18 U.S.C. § 371.  The elements of a conspiracy under this statute are: (1) "an agreement among two or more persons to achieve an unlawful objective;" (2) "knowing and voluntary participation in the agreement;" and (3) "an overt act by a conspirator in furtherance of the agreement."  United States v. Hasson, 333 F.3d 1264, 1270 (11th Cir. 2003).

The indictment alleged and the jury convicted Garcia of conspiring to achieve the unlawful object of obstructing justice under 18 U.S.C. § 1503(a).  The jury also convicted Garcia of obstruction of justice under the same statute, as charged in count ten.  "In order to sustain a conviction under . . . § 1503, the government must show that the accused (1) corruptly or by threats, (2) endeavored, (3) to influence, obstruct, or impede the due administration of justice."  United States v. Brand, 775 F.2d 1460, 1465 (11th Cir. 1985).  We have previously explained that "[t]o prove a conspiracy to violate § 1503, the government must . . . show that the actions the defendant agreed to take would themselves violate § 1503, that is, would have the natural and probable effect of interfering with the due administration of justice in a way that is more than merely speculative."  United States v. Vaghela, 169 F.3d 729, 734 (11th Cir. 1999) (internal quotation marks omitted).

**B.    The Evidence in Support of Counts Nine and Ten**

35

There was more than enough evidence for a reasonable jury to conclude that Garcia formed an agreement with other Montoya organization members to obstruct justice by murdering a government informant—Giraldo.  We need not recount this evidence a second time.

Although Garcia labels his argument as going to the sufficiency of the evidence, he does not actually argue that there was not enough evidence to convict him of these counts.  Rather, he makes two legal arguments, neither of which is availing.  First, Garcia contends that the conspiracy statute is limited to conspiracies to commit "any offense against the United States," see 18 U.S.C. § 371, whereas "the victim of [his] crime was not the United States but rather John [sic] Jairo Giraldo Garcia."  The Seventh Circuit has previously explained that the statutory language "any offense against the United States" refers to "any federal offense."  Iysheh v. Gonzales, 437 F.3d 613, 614 (7th Cir. 2006) (internal quotation marks omitted).  We agree with this intuitive analysis and reject Garcia's exceedingly narrow reading of the conspiracy statute.

Next, Garcia argues that the obstruction of justice statute, § 1503(a), only prohibits efforts to "influence, intimidate, or impede" certain individuals, including "any grand or petit juror or officer in or of any court of the United States, or officer who may be serving at any examination or other proceeding before any United

36

States magistrate judge or other committee [sic] magistrate." See 18 U.S.C.

§ 1503(a).

Garcia is correct that the statute does contain reference to these types of

persons. However, Garcia wholly ignores a subsequent clause in the statute which

provides that whoever "corruptly or by threats or force . . . influences, obstructs, or

impedes, or endeavors to influence, obstruct, or impede, the due administration of

justice, shall be punished as provided in subsection (b)." 18 U.S.C. § 1503(a).[7]

This subsequent clause, referred to as the "omnibus clause," is not tied to actions

directed at particular types of individuals. Instead, it applies broadly to all

"interferences with the due administration of justice." United States v. Brenson,

---

[7]Section 1503(a), in full, states as follows:

> Whoever corruptly, or by threats or force, or by any threatening letter or communication, endeavors to influence, intimidate, or impede any grand or petit juror, or officer in or of any court of the United States, or officer who may be serving at any examination or other proceeding before any United States magistrate judge or other committing magistrate, in the discharge of his duty, or injures any such grand or petit juror in his person or property on account of any verdict or indictment assented to by him, or on account of his being or having been such juror, or injures any such officer, magistrate judge, or other committing magistrate in his person or property on account of the performance of his official duties, or corruptly or by threats or force, or by any threatening letter or communication, influences, obstructs, or impedes, or endeavors to influence, obstruct, or impede, the due administration of justice, shall be punished as provided in subsection (b). If the offense under this section occurs in connection with a trial of a criminal case, and the act in violation of this section involves the threat of physical force or physical force, the maximum term of imprisonment which may be imposed for the offense shall be the higher of that otherwise provided by law or the maximum term that could have been imposed for any offense charged in such case.

18 U.S.C. § 1503(a).

37

104 F.3d 1267, 1275 (11th Cir. 1997) (internal quotation marks omitted).  As we have previously recognized, "the omnibus clause i[s] broad enough to cover any act committed corruptly, in an endeavor to impede or obstruct justice."  Id. (internal quotation marks omitted).  Moreover, "the statute . . . reaches all corrupt conduct capable of producing an effect that prevents justice from being duly administered, regardless of the means employed."  Id. (internal quotation marks and alteration omitted).  In light of this broad statute, we have no trouble concluding that Garcia's conduct—orchestrating the kidnapping, torture, and murder of a government informant—was capable of preventing justice from being duly administered.[8]  Accordingly, we affirm these convictions.

## VIII.  SUFFICIENCY OF THE EVIDENCE – COUNTS ELEVEN AND TWELVE

---

[8]Garcia also argues that his conviction on count ten should be vacated because 18 U.S.C. § 1111, the federal murder statute, is limited to offenses that occurred "[w]ithin the special maritime and territorial jurisdiction of the United States," whereas the murder of Giraldo occurred in Colombia.  See 18 U.S.C. § 1111(b).  However, Garcia was not convicted of murder under § 1111.  He was convicted of obstruction of justice under § 1503, which has no such territorial limitation. Although the indictment did refer to § 1111, it did not charge Garcia with violating that statute.  Rather, it cited § 1111 because the penalty provision in § 1503 states that "[t]he punishment for an offense under [§ 1503] is . . . in the case of a killing, the punishment provided in sections 1111 and 1112."  18 U.S.C. § 1503(b)(1).

Additionally, Garcia argues that there was no evidence that he "was ever told or otherwise knew . . . Giraldo was a U.S. informer."  Garcia is wrong.  Robayo testified that he (Robayo) and defendant Garcia attended a meeting with Eugenio where Eugenio instructed them to torture Giraldo to extract information about "what [Giraldo] was doing and what type of information he was providing to the Americans."  When asked whether he remembered "Eugenio saying that [Giraldo] was cooperating with the Americans?", Robayo answered "Yes."  A reasonable jury could rely on this evidence.

38

Garcia's last challenge is to his convictions on counts eleven and twelve for conspiracy to commit murder in retaliation for providing information to a federal law enforcement officer and the substantive offense of committing murder in retaliation for providing information to a federal law enforcement officer, in violation of 18 U.S.C. § 1513(a)(1)(B). Section 1513(a)(1)(B) provides that "[w]hoever kills or attempts to kill another person with intent to retaliate against any person for . . . providing to a law enforcement officer any information relating to the commission or possible commission of a Federal offense . . . shall be punished." 18 U.S.C. § 1513(a)(1)(B).

Garcia's argument on these counts is that Giraldo was not a person protected by the statute.[9] Garcia contends that "[a]ll John [sic] Jairo Giraldo Garcia did was identify people who worked with Diego Leon Montoya and pointed out on a map where he believed some of them could be located[,] . . . . [and] received money in Colombia and brought it to one of the Montoya family members in Miami under the vigil of the FBI."

Garcia's argument is frivolous. The facts that Garcia concedes more than establish that Giraldo was providing the FBI with information relating to the

---

[9]For the first time in his reply brief, Garcia argues that "there was no record evidence of Mr. Garcia's retaliatory intent with reference to whatever he did do relating to Garcia Giraldo retaliatory intent [sic]." We do not address this argument because "[w]e decline to consider arguments raised for the first time in a reply brief." United States v. Martinez, 83 F.3d 371, 377 n.6 (11th Cir. 1996).

Montoya organization's commission of multiple federal offenses. Thus, Garcia's challenge to his convictions on these counts fails.

In sum, we reject Garcia's arguments and we affirm his convictions.

## IX.  GOVERNMENT'S CROSS-APPEAL OF GARCIA'S SENTENCE

We now turn to the government's cross-appeal of defendant Garcia's 280-month sentence and explain why the district court did not abuse its discretion by imposing a sentence that was below the guidelines range set forth in the presentence investigation report ("PSI"). To do so, we first describe the PSI, and we then set forth the sentencing hearing. Afterwards, we analyze the substantive reasonableness of Garcia's sentence.

## A.    The PSI

In the PSI, Probation recommended a total offense level of 46, a criminal history category of I, and a resulting guidelines range of life imprisonment. Probation determined this offense level by first grouping together all seven convictions pursuant to U.S.S.G. § 3D1.2 and then applying the base offense level for the most serious count—the drug conspiracy conviction in count one. The base offense level for that offense was 43 because the drug conspiracy involved conduct that constituted murder. The PSI then added three levels pursuant to U.S.S.G. § 3B1.1(b) after determining that Garcia was a manager or supervisor of a conspiracy involving five or more participants.

The PSI also noted that Garcia was subject to: (1) mandatory minimum sentences of 10 years' imprisonment on counts one and two (the drug conspiracy counts), see 21 U.S.C. §§ 960(b)(1)(B), 841(b)(1)(A); (2) a statutory maximum term of 20 years' imprisonment on count three (the money laundering conspiracy count), see 18 U.S.C. § 1956(a)(1); (3) a statutory maximum of 5 years' imprisonment on count nine (the conspiracy to obstruct justice offense), see 18 U.S.C. § 371; and (4) any penalty on counts ten, eleven, and twelve (the obstruction of justice and murder offenses), see 18 U.S.C. §§ 1503(b)(1), 1513(a)(2)(A), and 1111.

Additionally, the PSI set forth the sentences that Garcia's co-defendants had received after pleading guilty pursuant to plea agreements. Because the district court stressed the need to avoid disparities between the sentences of defendant Garcia and his co-defendants, we set forth those co-defendants' sentences as follows: (1) Eugenio (the Montoya brother responsible for the Montoya organization's finances) received a 360-month sentence; (2) Juan Carlos (the Montoya brother responsible for the Montoya organization's drug trafficking operations) received a 262-month sentence; (3) Sanchez (the Montoya brothers' cousin, who worked as a bodyguard for his cousins) received a 235-month sentence; (4) Robayo (defendant Garcia's top deputy in his security operations) received a 140-month sentence; (5) Diego (the leader of the Montoya organization)

41

received a 540-month sentence; (6) Herrera (a veteran of the Colombian drug trafficking business recruited by Diego to assist in the "war" with Varela's rival drug organization) received a 235-month sentence; and (7) Perea (an ally of Diego's who, in 2005, became responsible for building a cocaine laboratory for the Montoya organization and who later oversaw the operations of that laboratory) received a 218-month sentence.

## B.    Sentencing Hearing

At sentencing, defendant Garcia asked the district court to vary downward and impose a sentence of 188 months.  Garcia's attorney stressed, inter alia: (1) Garcia's impoverished upbringing, which the attorney contended left Garcia with little choice but to join the Montoya organization; (2) Garcia's age of 62-years-old along with his pending deportation to Colombia, which made it unlikely that he would commit further crimes upon release; and (3) the need to avoid creating disparities between Garcia's sentence and the sentences of his co-defendants.  On this last point, Garcia's attorney acknowledged that Garcia's actions could potentially justify a sentence longer than the ones received by his co-defendants. However, Garcia's counsel argued that this aggravating fact was offset by the mitigating fact of Garcia's advanced age.

Afterwards, the government requested a sentence of between 546 months and 673 months.  Notably, the government did not request a guidelines sentence of

life imprisonment due to a "commitment" to the Colombian government which precluded federal prosecutors from seeking life sentences for Colombian drug traffickers prosecuted in the United States.  The government also acknowledged that a "norm" had previously been in place that any drug trafficker extradited to the United States from Colombia received no more than a 30-year American sentence.  However, the government stated that this norm was "no longer in place."  Thus, the government asked for a sentence of a term of years but asked that the district court not be bound by this 30-year maximum "norm."

In support of its request, the government suggested the district court should not consider the sentences of other members of the Montoya organization because they either had not been charged with an offense relating to murder or had pleaded guilty and not proceeded to trial.  Thus, the government argued that these defendants were not similarly situated to Garcia.  The government also suggested that Garcia was not merely a victim of the circumstances of his upbringing.  Instead, he was a person who "through his own violence and brutality, became one of Colombia's most feared enforcers."  Additionally, the government argued that Garcia's age should be an aggravating, not a mitigating, consideration.  The government contended that Garcia was before the district court "as an older man not because he committed one or two missteps late in life, but, rather, . . . because

43

he was involved in criminal activity for approximately two decades and he managed to have a very long and prolific career before he was captured."

After hearing from both parties and learning that defendant Garcia did not wish to speak, the district court took a brief recess in order to review the sentences it had imposed on Garcia's co-defendants.  Upon return from the recess, the district court sentenced Garcia to 280 months' imprisonment on counts ten, eleven, and twelve, to run concurrent with 120-month sentences on counts one, two, and three and a 60-month sentence on count nine (for a total 280-month sentence).

The district court explained that it was not imposing the sentence requested by the government because it could not "in good conscience, sentence [Garcia] to a term longer than the terms that Eugenio and Diego Montoya Sanchez were given."  The district court suggested that Garcia would not have committed the atrocious acts resulting in his convictions were it not for the leadership of the Montoya brothers.  Moreover, the district court believed that sentencing Garcia to a term longer than the Montoya brothers received would "send a message that you're punished just for going to trial."

Instead of sentencing Garcia based on the guidelines or the government's extrapolated version of them, the district court, among other things, "looked at the [sentences given to] the codefendants who operated in the role of enforcers similar to . . . Garcia."  The district court stated that it determined its sentence "[a]fter

44

<u>giving all of the factors great consideration</u> and based on [its] knowledge of what it is this defendant is responsible for." The district court acknowledged that Garcia's crimes were "among the worst crimes in humanity" and that it could not "think of anything worse than" Garcia's actions of "tortur[ing] and kill[ing] human beings."

## C.    Reasonableness Review of Garcia's Sentence

We review sentences for both procedural and substantive reasonableness. <u>United States v. Gonzalez</u>, 550 F.3d 1319, 1323 (11th Cir. 2008). Here, the government's argument is that Garcia's sentence is substantively unreasonable.[10] We review the substantive reasonableness of a sentence for an abuse of discretion. <u>Gall v. United States</u>, 552 U.S. 38, 56, 128 S. Ct. 586, 600 (2007). We will find an abuse of discretion when the district court: (1) "fails to afford consideration to relevant factors that were due significant weight"; (2) "gives significant weight to an improper or irrelevant factor"; or (3) "commits a clear error of judgment in considering the proper factors." <u>United States v. Irey</u>, 612 F.3d 1160, 1189 (11th Cir. 2010) (en banc) (internal quotation marks omitted).

However, we will vacate a sentence only when we "are left with the definite and firm conviction that the district court committed a clear error of judgment in

---

[10]To the extent that the government also argues Garcia's sentence is procedurally unreasonable because the district court failed to take into account all of the § 3553(a) factors, the record belies this argument. As stated, the district court explicitly stated that it had determined Garcia's sentence "after giving <u>all</u> of the factors <u>great consideration</u>." We assume that the "factors" to which the district court referred were the § 3553(a) factors.

weighing the § 3553(a) factors by arriving at a sentence that lies outside the range of reasonable sentences dictated by the facts of the case." Id. at 1190 (internal quotation marks omitted).

The record in this case does not leave us with such a "definite and firm conviction." Admittedly, Garcia's sentence was based on a downward variance from the guidelines range. However, the district court provided compelling justifications for imposing this variance. Moreover, the district court acknowledged the severity of Garcia's offenses and adequately took into account the § 3553(a) factors. Whether this Court would impose a longer sentence if we stood in the district court's place is irrelevant. As the district court noted, it selected Garcia's sentence after having sat through a lengthy jury trial and having heard all the evidence bearing on Garcia's culpability for his horrid conduct. Thus, we defer to the district court's first-hand experience in this particular case and decline to vacate Garcia's 280-month sentence as substantively unreasonable.

## X. CONCLUSION

In light of the foregoing, we affirm Garcia's convictions and sentences.

AFFIRMED